**ENVIRONMENTAL DEFENSE FUND, INC., Plaintiff,**

v.

**WHEELABRATOR TECHNOLOGIES INC. and Westchester Resco Company, L.P., Defendants.**

**No. 88 Civ. 0560 (CSH).**

United States District Court, S.D. New York.

Nov. 21, 1989.

Environmental Defense Fund, Inc., New York City (Michael E. Herz, of counsel),

Environmental Defense Fund, Inc., Washington, D.C. (Karen Florini, and Kathie A. Stein, of counsel), for plaintiff.

Debevoise & Plimpton, New York City (John G. Koeltl, Daniel G. Murphy, and Terry E. Thornton, of counsel), Beveridge & Diamond, Washington, D.C. (Harold Himmelman, Karl S. Bourdeau, and David M. Friedland, of counsel), Kirkpatrick & Lockhart, Pittsburgh, Pa. (Joseph A. Katarincic, of counsel), for defendants.

New York Lawyers for the Public Interest, New York City (Herbert Semmel, of counsel), amicus curiae for the American Public Health Ass'n.

District Council 37, New York City (Joel Giller, and Leonard Shrier, of counsel), amicus curiae, for American Federation of State, County & Municipal Employees.

Nitkin, Alkalay, Handler, Robbins & Korn, New York City (Henry Korn, of counsel), Crowell & Moring, Washington, D.C. (Ridgway M. Hall, Jr., Robert C. Davis, Jr., and B. Michael Hodge, of counsel), amicus curiae, for Tricil, Inc.

Rosenman & Colin, New York City (Marvin R. Lange, of counsel), amicus curiae for County of Westchester.

Robert Abrams, Atty. Gen. of the State of New York, New York City (Marc S. Gerstman, of counsel), amicus curiae for New York State Dept. of Environmental Conservation.

Wilson, Elser, Moskowitz, Edelman & Dicker, New York City (David L. Wong, of counsel), National Solid Wastes Management Ass'n, Office of the General Counsel, Washington, D.C. (Bruce J. Parker, of counsel), amicus curiae for The Institute of Resource Recovery.

Nixon, Hargrave, Devans & Doyle, New York City (Frank H. Penski, Philip F. Cronin, Jr., Richard M. Cogen, and Dexter Ewel, of counsel), The United States Conference of Mayors, Office of the General Counsel, Washington, D.C. (Gerard L. Lederer, of counsel), amicus curiae for The U.S. Conference of Mayors and The National Resource Recovery Ass'n.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

This important environmental case raises issues of the proper construction of a federal statute governing hazardous waste, and defendants' compliance with the statutory and regulatory scheme.

The case is now before the Court on defendants' motion to dismiss pursuant to Rule 12(b)(6), Fed.R.Civ.P., or in the alternative, for summary judgment pursuant to Rule 56(b), and plaintiff's cross-motion for summary judgment pursuant to Rule 56(a).[1]

### Background
*Statutory Framework*

Plaintiff the Environmental Defense Fund, Inc. ("EDF") contends that defendants have violated certain portions of the Resource Conservation and Recovery Act of 1976 ("RCRA"), 42 U.S.C. § 6901 *et seq.*, and the regulations promulgated thereunder both by the federal Environmental Protection Agency ("EPA") and the New York Department of Environmental Conservation ("DEC").[2]

Subtitle C of the RCRA "established a 'cradle to grave' regulatory scheme governing the treatment, storage, and disposal of hazardous wastes."[3] *Environmental De-*

---

**1.** By leave of Court, briefs *amici curiae* supporting plaintiff were filed by the American Public Health Association, the American Federation of State, County & Municipal Employees, and Tricil, Inc.

Briefs supporting defendants were filed by the County of Westchester, the New York State Department of Environmental Conservation, the Institute of Resource Recovery, and the National Resource Recovery Association and the United States Conference of Mayors (joint brief).

**2.** EDF does not allege an independent violation of state law, but rather claims that "[v]iolation of the New York regulations ... constitutes violation of regulations that have become effective pursuant to Subtitle C of RCRA." Complaint at ¶ 11.

**3.** The EPA promulgated regulations pursuant to the RCRA dealing with the classification of solid wastes as either hazardous or non-hazardous. Certain wastes are listed as *per se* hazardous. 40 C.F.R. § 261.30–261.33(f). Those wastes not

*fense Fund v. E.P.A.*, 852 F.2d 1316, 1318 (D.C.Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 1120, 103 L.Ed.2d 183 (1989). Solid wastes not classified as hazardous are regulated under Subtitle D of the statute.

Pursuant to Section 3006(b) of the RCRA, 42 U.S.C. § 6926(b), a state may seek authorization from the EPA to administer and enforce a hazardous waste program in that state. If the Administrator of the EPA accepts the state's proposed program as in keeping with the strictures of federal law, the state is authorized to administer its program in place of a federal program. The EPA, however, retains responsibility for overseeing the hazardous waste programs of the states.

On May 29, 1986, New York's application to operate a hazardous waste program in lieu of the federal program was granted. The New York regulations, which mirror those promulgated by the EPA, are codified at 6 N.Y.Comp.Codes R. & Regs. Parts 370–374 ("NYCRR").

*Factual Background*

Plaintiff EDF is a "non-profit, public benefit membership corporation organized under the laws of the State of New York." Complaint at ¶ 4. EDF characterizes itself as "a national environmental advocacy organization supported by approximately 60,-000 dues-paying members." *Id.*

Defendants Wheelabrator Technologies Inc. ("WTI") and Westchester Resco Company, L.P. ("Resco") own and operate the Westchester Resource Recovery Facility [4] ("the Facility") in Peekskill, New York. Resco designed the Facility pursuant to a 1981 agreement entered into by the County of Westchester and Wheelabrator–Frye Inc.[5]

The Facility processes approximately 650,000 tons of solid waste, both household and non-hazardous municipal waste, annually. In processing that amount of solid waste, the Facility generates roughly 330 million kilowatt hours of electricity each year. A byproduct of the waste recovery process is ash. Approximately 500 tons of ash are produced by the Facility daily. EDF contends that the ash is a hazardous waste [6] and must therefore be disposed of as such.

Specifically, EDF contends that defendants are in violation of federal regulations requiring that generators of hazardous waste apply for and receive a United States EPA number before engaging in the treatment, storage, disposal, transportation, or offering for transportation of hazardous waste. 40 C.F.R. § 262.12. An analogous requirement is found in the New York state framework. 6 NYCRR § 371.3.

It is uncontested that the ash produced by the Facility is not dealt with pursuant to the regulations governing the handling and disposal of hazardous wastes. The Westchester County Refuse Disposal District No. 1 ("District") owns and operates an ashfill where the Facility's ash is brought for disposal. That ashfill, the Sprout Brook Residue Disposal Site ("Sprout Brook"), located in Cortlandt, New York, is not a licensed hazardous waste disposal facility.[7] Defendants have further not

listed by the EPA as *per se* hazardous are deemed such only if they exhibit one of the following four characteristics: corrosivity, ignitability, reactivity, or toxicity, 40 C.F.R. § 261.21–261.24, and are not otherwise exempt from classification as a hazardous waste. 40 C.F.R. § 261.3(a)(1).

4. A resource recovery facility "refers generally to facilities that burn solid waste in order to recover useful thermal energy (as steam or electricity) and to reduce the weight and volume of waste requiring landfill disposal." Affidavit of Ronald J. Broglio sworn to on March 19, 1988 at ¶ 4.

5. Wheelabrator–Frye Inc. is a predecessor of WTI.

6. The ash produced at the Facility failed the EP toxicity test, Procedure set forth at Appendix II to 40 C.F.R. § 261.33, nine out of the past ten times samples have been tested. Exhibit 2 attached to Plaintiff's Memorandum; Defendants' Exhibit 24 at B–6. The EP toxicity test is a measure of the hazardous qualities of solid waste. *See Al Tech Specialty Steel Corp. v. E.P.A.*, 846 F.2d 158, 160 (2d Cir.1988) (per curiam) (waste is subject to regulation as hazardous where it fails the EP toxicity test, a characteristic of hazardous wastes).

7. Disposal facilities dealing with hazardous waste must also obtain an EPA identification number. 40 C.F.R. § 262.12. Again, an analogous regulation is found in the New York state scheme. 6 NYCRR § 371.3.

complied with those regulations governing the transportation and disposal of hazardous waste.[8]

EDF contends that defendants' generation of ash which fails the EP toxicity test subjects the handling of that ash to federal regulations governing the generation, management and disposal of hazardous wastes. Defendants do not contest that they are not in compliance with those regulations, but rather argue that the RCRA itself exempts resource recovery facilities from the strictures of Subtitle C.

Plaintiff argues that the regulatory "EP [toxicity] test governs as a matter of law", citing *Al Tech Specialty Steel Corp. v. E.P.A., supra;* and, "since defendants have admitted that their ash fails the EP toxicity test and that they do not comply with the hazardous waste laws, plaintiff is entitled to judgment as a matter of law." Plaintiff's Reply Memorandum at 3–4, 1.

The argument assumes its basic premise: that defendants are subject to hazardous waste regulation under Subtitle C, of which the EP toxicity test forms a part. But if a proper construction of the statute excludes defendants from compliance with hazardous waste laws, their conceded non-compliance has no legal significance. The Second Circuit's opinion in *Al Tech* does not change this analysis, since the corporate defendant in that case, a specialty steel maker which constructed a collection basin on its property to deal with toxic precipitations, did not claim a statutory exclusion from hazardous waste regulation, and could not have done so.

I turn then to the statutory and regulatory scheme.

### Discussion

In May 1980, after the 1976 passage of the RCRA, the EPA implemented a regulatory provision termed the "household waste exclusion." [9] In the preamble to the 1980 household waste exclusion, the EPA made clear that the ash residue produced as a byproduct of the incineration of household waste was exempt from regulation under Subtitle C of the RCRA.

> The Senate language makes it clear that household waste does not lose the exclusion simply because it has been collected. Since household waste is excluded in all phases of its management, residues remaining after treatment (e.g., incineration, thermal treatment) are not subject to regulation as hazardous waste. Such wastes, however, must be transported, stored, treated and disposed in accord with applicable State and federal requirements concerning management of solid waste (including any requirements specified in regulations under Subtitle D of RCRA.)....

45 Fed.Reg. 33,099 (May 19, 1980). The EPA went on to note that when "household waste is mixed with other hazardous wastes, ... the mixture will be deemed hazardous" and thus subject to the regulations of Subtitle C. *Id.* It is common ground that the ash resulting from the

---

**8.** Generators of hazardous waste are required to prepare a shipping manifest designating a licensed disposal facility. The generator is to maintain a copy of the manifest on file. 40 C.F.R. § 262.20–.23. 6 NYCRR § 372.2(a), 372.-2(b)(5)(iii).

Before shipping, hazardous waste must be packaged, labelled, marked, and placarded according to specific regulations. 40 C.F.R. § 262.30–.33, 6 NYCRR § 372.2(a)(4)–(7). Hazardous waste must further be accumulated in labelled containers. 40 C.F.R. § 262.34, 6 NYCRR § 372.2(a)(8).

A generator of hazardous waste must also maintain certain records and is required to submit an annual report to the state DEC. 40 C.F.R. § 262.40–.43, 6 NYCRR § 373.2(c).

**9.** That exclusion provided as follows:

§ 261.4 Exclusions

(b) *Solid wastes which are not hazardous wastes.*

The following solid wastes are not hazardous wastes:

(1) Household waste, including household waste that has been collected, transported, stored, treated, disposed, recovered (e.g., refuse-derived fuel) or reused. "Household waste" means any waste material (including garbage, trash and sanitary wastes in septic tanks) derived from households (including single and multiple residences, hotels and motels.)

45 Fed.Reg. 33,120 (May 19, 1980) (codified as amended at 40 C.F.R. § 261.4(b)(1) (1987)).

incineration of household waste is not subject to regulation as a hazardous waste.[10]

In 1984 Congress sought to "clarify" the household waste exclusion in respect of its applicability to municipal wastes generally, including non-hazardous commercial and industrial wastes. Congress therefore enacted the following provision:

(i) Clarification of household waste exclusion

A resource recovery facility recovering energy from the mass burning of municipal solid waste shall not be deemed to be treating, storing, disposing of, or otherwise managing hazardous wastes for the purposes of regulation under this subchapter if—

(1) such facility—

(A) receives and burns only—

(i) household waste (from single and multiple dwellings, hotels, motels, and other residential sources), and

(ii) solid waste from commercial or industrial sources that does not contain

hazardous waste identified or listed under this section, and

(2) the owner or operator of such facility has established contractual requirements or other appropriate notification or inspection procedures

to assure that hazardous wastes are not received at or burned in such facility. RCRA Section 3001(i), 42 U.S.C. § 6921(i).[11] The instant controversy centers on the proper construction and scope of the 1984 clarification.

Defendants contend that Section 3001(i) exempts the Facility from those regulations, codified at 40 C.F.R. Part 262, governing the generation of hazardous waste. Plaintiff argues that Section 3001(i) does not exempt resource recovery facilities accepting commercial wastes from regulations governing the generation of hazardous waste, but only from those regulations, codified at 40 C.F.R. Parts 264–68 and 270, concerning the management of hazardous waste.[12]

**10.** Although the parties are in agreement that the 1980 exclusion extends to ash residue, EDF takes exception to the EPA's judgment that Congress intended such an exemption. Plaintiff's Memorandum at 25 n. 14 ("plaintiff considers the application of the pure household waste exclusion to ash residues inconsistent with the statute"); Plaintiff's Reply Memorandum at 12 ("EPA's justification for applying the household waste exclusion to ash—itself of doubtful validity—was the perceived Congressional intent to exclude an entire waste stream").

**11.** The equivalent regulation is found in the New York scheme.

(2) Solid wastes which are not hazardous wastes. The following solid wastes are not hazardous wastes:

(i) household waste, including household waste that has been collected, transported, stored, treated, disposed, recovered (e.g., refuse-derived fuel) or reused. *Household waste* means any waste material (including garbage, trash and sanitary wastes in septic tanks) derived from households (including single and multiple residences, hotels and motels, bunkhouses, ranger stations, crew quarters, campgrounds, picnic grounds and day-use recreation areas). A resource recovery facility managing municipal waste shall not be deemed to be treating, storing, disposing of, or otherwise managing hazardous waste for the purpose of regulation, if such facility:

(a) receives and burns only:

(1) household waste (from single and multiple dwellings, hotels, motels and other residential sources); and

(2) solid waste from commercial or industrial sources that does not contain hazardous waste; and

(b) does not accept hazardous waste and the owner or operator of such facility has established contractual requirements or other appropriate notification or inspection procedures to assure that hazardous wastes are not received at or burned in the facility.

NYCRR § 371.1(e)(2)(i) (1987) (emphasis in original).

**12.** EDF contends that Section 3001(i) merely exempts the Facility from regulation as a treatment, storage and disposal ("TSD") facility (facilities that manage, rather than produce hazardous waste). However, by its own terms Section 3001(i) does not apply to resource recovery facilities that accept hazardous waste for incineration, and plaintiff argues that if a resource recovery facility should ever accept hazardous waste, even accidentally, it would not be eligible for exemption even from regulation as a TSD facility. Under plaintiff's construction of Section 3001(i) it is difficult to understand what, if any, benefit the Facility derives from the exemption. Plainly, if the Facility never accepts hazardous waste for processing, it would not be subject to regulation as a TSD facility even absent the exclusion.

I. *Construction of Section 3001(i)*

A. *Plain Language of the Statute*

Defendants contend that Section 3001(i) is clear in its intent to exclude the ash generated by the waste recovery process from regulation under Subtitle C. Arguing that this Court need not look beyond the pleadings and the plain meaning of Section 3001(i), the defendants move for dismissal pursuant to Rule 12(b)(6).

Defendants argue that the "otherwise managing" language in Section 3001(i) "applies to all the waste management activities of a facility, including managing and disposing of the ash residue." Defendants' Memorandum at 15. Therefore, any waste resource recovery facility that "burns only residential and other non-hazardous waste and establishes the requisite contractual or other specified safeguards is not subject to regulation under Subtitle C." *Id.* I do not think the meaning of the statute so clear.

Section 3001(i) does not, in plain words, exclude the Facility from those regulations regarding the generation of hazardous waste; that term is nowhere mentioned in the statutory language. Further, the ash produced as a byproduct of the resource recovery process is not specifically exempted from regulation under the terms of Section 3001(i). The "otherwise managing" language of the statute could arguably be read as that sort of general catchall provision often included in involved statutory frameworks.[13] The precise meaning of the phrase is not ascertainable without turning to the legislative history.

B. *Legislative History*

The legislative history of the 1984 exclusion makes clear Congress' intent to exclude ash generated by an excluded facility from regulation under Subtitle C of the RCRA. Commenting on Section 3001(i), the Report of the Senate Committee on Environment and Public Works, which accompanied the proposed legislation, said the following:

> The reported bill adds a subsection (d) [sic] to section 3001 to clarify the coverage of the household waste exclusion with respect to resource recovery facilities recovering energy through the mass burning of municipal solid waste. This exclusion was promulgated by the Agency [EPA] in its hazardous waste management regulations established to exclude waste streams generated by consumers at the household level and by sources whose wastes are sufficiently similar in

**13.** EDF argues that the plain language of the statutory exclusion, when read in conjunction with the definitional section of the statute, establishes its construction of Section 3001(i). The definitional section of the statute sets forth the meaning of "disposal", "hazardous waste generation", and "hazardous waste management" separately. EDF contends that the separate definition of these terms is dispositive of Congress' intent in enacting Section 3001(i).

(3) The term "disposal" means the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.
(6) The term "hazardous waste generation" means the act or process of producing hazardous waste.
(7) The term "hazardous waste management" means the systematic control of the collection, source separation, storage, transportation, processing, treatment, recovery, and disposal of hazardous wastes.
42 U.S.C. § 6903(3), (6), (7).

Although the statute does not define otherwise managing hazardous wastes, the definition most on point is that of "hazardous waste management". Plaintiff concludes that the Facility cannot argue exemption from those regulations governing the generation of hazardous waste and the disposal of the waste it generates because the term generation is defined separately from management and is not specifically mentioned in Section 3001(i). I do not agree.

The definition of "management" is sufficiently broad, particularly in view of the fact that the term disposal is specifically enumerated in Section 3001(i), to warrant examination of the legislative history on the point. I say this also in view of the fact that Section 3001(i) is explicitly termed a clarification of the 1980 household waste exclusion which is understood by the parties to extend to the ash byproduct generated by the waste recovery process. Further, Subtitle C as a whole is captioned "HAZARDOUS WASTE MANAGEMENT," a fact which lends support to defendants' argument that the "otherwise managing" language of the exclusion is meant to exempt the Facility from all regulation under that subtitle.

both quantity and quality to those of households.

Resource recovery facilities often take in such "household wastes" mixed with other, non-hazardous waste streams from a variety of sources other than "households," including small commercial and industrial sources, schools, hotels, municipal buildings, churches, etc. It is important to encourage commercially viable resource recovery facilities and to remove impediments that may hinder their development and operation. New section 3001(d) [sic] clarifies the original intent to include within the household waste exclusion activities of *a resource recovery facility* which recovers energy from the mass burning of household waste and non-hazardous waste from other sources.

*All waste management activities* of such a facility, including the *generation*, transportation, treatment, storage and disposal *of waste* shall be covered by the exclusion, if the limitations in paragraphs (1) and (2) of subsection (d) [sic] are met.

S.Rep. No. 284, 98th Cong., 2nd Sess. 61 (1983) ("Senate Report") (emphasis added).

The Conference Committee adopted, without change, the provision proposed by the Senate:

SECTION 223—CLARIFICATION OF HOUSEHOLD WASTE EXCLUSION

*House Bill.*—No provision.

*Senate amendment.*—The Senate amendment clarifies that an energy recovery facility is exempt from hazardous waste requirements if it burns only residential and non-hazardous commercial wastes and establishes procedures to assure hazardous wastes will not be burned at the facility.

*Conference substitute.*—The Conference substitute is the same as the Senate amendment.

H.R.Conf.Rep. No. 1133, 98th Cong., 2nd Sess. 79, 106 (1984), *reprinted in* 1984 U.S. Code Cong. & Admin.News 5576, 5649, 5677.

The report of the relevant Senate Committee, delivered contemporaneous with the provision at issue, makes clear that the exclusion was meant to extend to ash and other wastes generated in the process of resource recovery, so as long as the particular facility does not accept hazardous waste for incineration and has in place the appropriate mechanisms for ensuring that no such waste is accepted. The Senate report could not be more explicit. It includes the term "generation", that term upon which EDF places so much emphasis. While it is true that the legislation itself does not include the term generation and that it is the legislation with which we are concerned, the legislative history is probative on the issue of Congress' intent, given that the scope of the statute is unclear on its face.

Moreover, I think it important to note, as does the report of the Senate committee, that the 1984 statutory provision "clarifies" a previously existing regulatory exclusion, which clearly extended to ash. *See supra* at n. 10. Nowhere in the 1984 exclusion, nor in the Committee report which accompanied it, is there any hint of a congressional intent to limit the scope of that earlier exclusion. EDF argues that the ash resulting from the incineration of household waste remains exempt from regulation under Subtitle C, pursuant to the 1980 exclusion, but that ash generated by a facility that accepts municipal as well as household waste is not so exempt. I do not think that a fair reading of the statute. More important, neither, according to its declarations, would Congress.

Congress clearly knew of the EPA's interpretation of the 1980 regulation, and had it disagreed, would have made clear its disagreement. *See Young v. Community Nutrition Institute*, 476 U.S. 974, 983, 106 S.Ct. 2360, 2365, 90 L.Ed.2d 959 (1986) (*quoting NLRB v. Bell Aerospace, Co.*, 416 U.S. 267, 275, 94 S.Ct. 1757, 1762, 40 L.Ed.2d 134 (1974)) ("congressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress"). Instead Congress clarified its "original intent to include within the household waste exclusion activities of a resource recovery facility which recovers en-

ergy from the mass burning of household waste and non-hazardous waste from other sources." Senate Report at 61.

### C. *Agency Interpretation*

In 1985, the EPA promulgated a regulation that mirrored Section 3001(i). 40 C.F.R. § 261.4(b)(1). In a preamble to the ·regulation, the EPA interpreted the clarification as follows:

> The statute is silent as to whether hazardous residues from burning combined household and non-household, non-hazardous waste are hazardous waste. These residues would be hazardous wastes under present EPA regulations if they exhibited a characteristic. The legislative history does not directly address this question although the Senate report can be read as enunciating a general policy of non-regulation of these resource recovery facilities if they carefully scrutinize their incoming wastes. On the other hand, residues from burning could, in theory, exhibit a characteristic of hazardous waste even if no hazardous wastes are burned, for example, if toxic metals become concentrated in the ash. Thus, the requirement of scrutiny of incoming wastes would not assure non-hazardousness of the residue. EPA believes that the principal purpose of section 3001(g) [sic] was to prevent resource recovery facilities that may inadvertently burn hazardous waste, despite good faith efforts to avoid such a result, from becoming subject to the Subtitle C regulations. EPA does not see in this provision an intent to exempt the regulation of incinerator ash from the burning of non-hazardous waste in resource recovery facilities if the ash routinely exhibits a characteristic of hazardous waste. However, EPA has no evidence to indicate that these ash residues are hazardous under existing rules. EPA does not believe the HSWA [Hazardous and Solid Waste Amendments of 1984] impose new regulatory burdens on resource recovery facilities that burn household and other non-hazardous waste, and the Agency has no plans to impose additional responsibilities on these facilities. Given the highly beneficial nature of resource recovery facilities, any future additional regulation of their residues would have to await consideration of the important technical and policy issues that would be posed in the event serious questions arise about the residues.

50 Fed.Reg. 28, 725–26 (July 15, 1985).

Although at the time of issuing the Preamble, the EPA was manifestly of the view that Section 3001(i) did not wholly exempt ash exhibiting characteristics of hazardousness from regulation as such, that view rests on a questionable reading of the statute and the legislative history. For this reason, the EPA's interpretation, normally entitled to substantial deference, carries little weight with this Court. *See United States v. Riverside Bayview Homes, Inc.,* 474 U.S. 121, 131, 106 S.Ct. 455, 461, 88 L.Ed.2d 419 (1985) ("[a]n agency's construction of a statute it is charged with enforcing is entitled to deference if it is reasonable and not in conflict with the expressed intent of Congress") (citations omitted). The EPA's interpretation of Section 3001(i) is in direct conflict with the expressed intent of Congress as that intent is manifested in the legislative history.

▪ Deference to an agency's construction of the statute which it administers "is appropriate only when Congress has not directly addressed the precise question at issue, *Chevron U.S.A. v. N.R.D.C.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984), a circumstance that arises if it can fairly be said that Congress 'did not actually have an intent' regarding the point at issue." *New York State Motor Truck Association, Inc. v. City of New York,* 654 F.Supp. 1521, 1536 (S.D.N.Y.), *aff'd. per curiam,* 833 F.2d 430 (2d Cir. 1987). In the case at bar, the congressional intent with respect to the statutory exemption at issue appears with sufficient clarity from the legislative history.[14]

14. Moreover, the EPA's views on the subject are internally inconsistent, even in the 1985 Preamble. To the extent the EPA thought ash exhibiting characteristics of hazardousness should be

Even the EPA appears to have recognized the questionable basis for its determination that ash is subject to regulation as a hazardous waste. On December 3, 1987, J. Winston Porter, the Assistant Administrator for the Office of Solid Waste and Emergency Response, who was then responsible for the implementation of the RCRA at the EPA, testified before the Senate Subcommittee on Hazardous Waste and Toxic Substances of the Committee on Environment and Public Works. He did so in response to a letter invitation of the Subcommittee in which it was requested that he address nine separate issues, including the status of incinerator ash. On that question, Porter said the following:

Currently, EPA's regulations merely restate the statutory language. In the preamble codifying this statutory language, however, EPA advanced an interpretation of the statute that would subject ash residue's [sic] from energy-recovering MWC's [Municipal Waste Combustors] to Subtitle C regulation if the ash exhibited a characteristic of hazardous waste. The Agency has reexamined that interpretation and now concludes that it may have been in error. The Agency believes that the language and legislative history of Section 3001(i) were probably intended to exclude these ash residues from regulation under Subtitle C.

It seems clear that Congress' interest in Section 3001(i) was to encourage energy recovery. Under the section, the reach of the household exclusion was to be extended for facilities that recover energy. The Agency's prior interpretation of the section would restrict the exclusion with respect to ash residue for facilities that recover energy as well as those that do not. This appears inconsistent with the reach of the household exclusion itself (which clearly covers ash). It also appears inconsistent with the expressed legislative intent that "[a]ll waste management activities of such a facility, including the *generation*, transportation, treatment, storage, and *disposal* of waste shall be covered by the exclusion...." S.Rep. at 61 (emphasis added).

December 3, 1987 testimony of J. Winston Porter at 16–17. Thus, in 1987, the EPA official responsible for the implementation of the RCRA questioned whether the agency's 1985 interpretation of the statute was consistent with Congress' intent as expressed in the Senate Report. Although Porter did not officially announce a reversal in agency policy on the matter,[15] he clearly indicates the EPA's confusion on the point.

On May 11, 1989, Congressman Thomas A. Luken, Chairman of the House Subcommittee on Transportation and Hazardous Materials, called a hearing on H.R. 2162, a proposal to regulate ash as a "special waste" under Subtitle D of the RCRA. In his opening comments, Congressman Luken said the following:

A statutory ambiguity has caused a great deal of uncertainty with respect to how this ash should be regulated.

The very basic question of whether or not ash should be regulated under subtitle D, as a solid waste, or under subtitle

---

regulated, it appears to have left open the question of how such regulation should be accomplished. Specifically, the EPA seems to have left for another day the issue of whether a new set of regulations, taking into account existing technology for the treatment of ash, should be promulgated, or whether regulation should proceed under Subtitle C of the RCRA. Of course, whether such regulation would be in violation of Section 3001(i) is a question not before me.

15. Porter's testimony calls into question the finality with which the EPA views its own 1985 interpretation of Section 3001(i). Porter says the following:

First, in the near term we [EPA] are planning to develop the following items:
* Technical guidance for the proper handling for MWC ash; and
* Our legal interpretation of the status of MWC ash with respect to Subtitle C (hazardous waste) and Subtitle D (solid waste) portions of the RCRA.
After taking comment on those above aspects, our intent is to develop a regulation for MWC ash as a "special waste" [under Subtitle D].
December 3, 1987 testimony of J. Winston Porter at 14–15.

C as a hazardous waste, remains ambiguous in the statute.

\*    \*    \*    \*    \*    \*

This uncertainty has been exacerbated by *conflicting signals sent by the EPA.* That is not a criticism of EPA.

Originally the EPA stated that incinerator ash must be tested for toxicity, and managed accordingly, but more recently the EPA has made various pronouncements which conflict with that original policy.

It has become clear that legislative action is needed.

\*    \*    \*    \*    \*    \*

The bill which we will consider today ... clarifies once and for all that municipal solid waste incinerator ash is to be regulated under subtitle D, and not subtitle C, of RCRA.

Regulation of Municipal Solid Waste Incinerators: Hearings on H.R. 2162 before the Subcommittee on Transportation and Hazardous Materials of the House Committee on Energy and Commerce, 101st Cong., 1st Sess. 1–2 (May 11, 1989) (emphasis added).

In that May 11, 1989 hearing, Sylvia Lowrance, the then Director of the Office of Solid Waste, offered the following comments:

In our codification of it [Section 3001(i)] we stated that, in our view, the provision excludes energy recovery facilities burning household waste along with nonhazardous waste from commercial and industrial sources from regulation under subtitle C.

With regard to the ash, however, produced from such facilities, we said in a 1985 notice that the ash generated by these facilities which exhibits a characteristic of the hazardous waste must be managed as a hazardous waste.

We continue to follow that 1985 policy, and that is our current interpretation. However, there is substantial controversy surrounding that interpretation. We are in litigation challenging the EPA's interpretation of section 3001(i). We believe the law is *ambiguous given it is silent with regard to treatment of ash under that section.*

We do believe it needs to be clarified. What we believe is of paramount importance is that ash be safely managed in a technically sound matter.

Until this legal controversy is resolved, there is going to continue to be uncertainty on the part of communities trying to deal with their garbage crisis with regard to what ultimate requirements and cost will be for their municipal solid waste management.

We very much support an approach such as the one taken in H.R. 2162, which would provide clear authority to the EPA to regulate municipal combustor ash as a special waste under subtitle D of RCRA.

*Id.* at 33 (emphasis added); *see also id.* at 44 ("a special waste program under Subtitle D, tailored to ash, could be consistent, practical, and environmentally safe"). It is clear from Ms. Lowrance's testimony that although she regards official EPA policy to have remained unchanged since 1985, the agency regards the statute as ambiguous on the issue of ash and is desirous of clarification on the point.

Although the EPA's official position has arguably remained unchanged since the agency first interpreted the exclusion in 1985, the agency has certainly called the validity of its own views into doubt, calling for legislative clarification of the issue. Indeed, in the 1987 hearings before the Senate Subcommittee on Hazardous Waste and Toxic Substances, the finality of that 1985 interpretation was called into question. *See supra* note 15 ("in the near term we [EPA] are planning to develop ... [o]ur legal interpretation of the status of MWC ash with respect to Subtitle C (hazardous waste) and Subtitle D (solid waste) portions of the RCRA"). In these circumstances, an additional reason for rejecting the agency interpretation urged upon this Court by EDF[16] is the "inconsistency of the posi-

16. Of course, the EPA's interpretation, even if it were entitled to deference in these proceedings, would not be binding on this Court. As an "interpretative rule", the agency's views would

tions the [EPA] has taken through the years." *Immigration and Naturalization Service v. Cardoza–Fonesca*, 480 U.S. 421, 446 n. 30, 107 S.Ct. 1207, 1220–1221 n. 30, 94 L.Ed.2d 434 (1986).

> An agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is "entitled to considerably less deference" than a consistently held agency view.

*Id.* (citations omitted).

### D. *Subsequent Congressional Views*

EDF submits two letters of October 2, 1987, one signed by six Senators and the other by a member of the House of Representatives, in support of its construction of Section 3001(i). The first letter, signed by Senators Stafford, Durenberger, Chafee, Burdick, Baucus, and Mitchell ("Senators' Letter"), addressed to Lee Thomas of the EPA, said the following:

> We are writing to urge that the Agency [EPA] refrain from issuing any policy statements or legal interpretations of the Resource Conservation and Recovery Act as it relates to the management of ash generated by municipal solid waste incinerators pending further consultation and coordination with the Congress. We are concerned that the Agency may be on the verge of interpreting these requirements, possibly in a manner inconsistent with the law, at a time our Committee is considering legislation specifically resolving this issue.
>
> In our view, section 3001(i) of the Solid Waste Disposal Act, often known as RCRA, as amended in 1984 does not exempt owners or operators of municipal solid waste incinerators from their obligations: 1) to determine whether the ash residues generated by the incineration process are hazardous wastes, and 2) to handle ash exhibiting hazardous waste characteristics as hazardous wastes in accordance with the requirements of Subtitle C of RCRA. Thus, we concur in the Agency's statement in the preamble to the July 15, 1985 codification rule that in the 1984 amendments Congress did *not* "exempt the regulation (sic) of incinerator ash from the burning of non-hazardous waste in resource recovery facilities if the ash routinely exhibits a characteristic of hazardous waste."

Senators' Letter at 1.

A similar theme is echoed in the letter of Representative James J. Florio, then Chairman of the House Subcommittee on Commerce, Consumer Protection, and Competitiveness.

> While such an exclusion obviously lacks any justification on environmental grounds, it is equally clear that there is no statutory basis for such an exclusion. Although those seeking an exclusion have focused on the "household waste clarification" contained in the 1984 Hazardous and Solid Waste Amendments, this provision does not exempt owners or operators of municipal solid waste incinerators from their obligations: 1) to determine whether the ash residues generated by the incineration process are hazardous wastes and 2) to handle ash exhibiting hazardous waste characteristics as hazardous wastes in accordance with the requirements of Subtitle C of RCRA.

Letter of Representative Florio to Lee Thomas dated October 2, 1987 at 1 ("Florio Letter").

EDF argues that the views expressed in these letters are entitled to "significant

at most carry a heightened power of persuasion, but not the force of law.

> As a starting point, ... the agency's characterization of a rule is "relevant," although not necessarily "dispositive." ... "An interpretative rule simply states what the administrative agency thinks the [underlying] statute means, and only ' "reminds" affected parties of existing duties.' On the other hand, if by its action the agency intends to create new law, rights or duties, the rule is properly considered to be a legislative rule."

> \* \* \* \* \* \*
>
> Stated slightly differently, " 'interpretative rules are statements as to what the administrative officer thinks the statute or regulation means,' " whereas legislative rules have "effect[s] *completely independent* of the statute." *United Technologies Corp. v. United States Environmental Protection Agency*, 821 F.2d 714, 718 (D.C.Cir.1987) (citations omitted) (emphasis in original).

weight ... particularly ... when the precise intent of the enacting Congress is obscure." Plaintiff's Memorandum at 23. In support of that proposition, plaintiff cites *Seatrain Shipbuilding Corp. v. Shell Oil Co.*, 444 U.S. 572, 596, 100 S.Ct. 800, 813, 63 L.Ed.2d 36 (1980). However, that was a case dealing with a committee report which accompanied the legislation at issue. Such is not the case here. The letters on which plaintiff relies were written a full three years after the passage of Section 3001(i). They are not even the contemporaneous views of the authors, much less of Congress as a whole. *See Consumer Product Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 117, 100 S.Ct. 2051, 2060, 64 L.Ed.2d 766 (1980) (" 'the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one' ") (citation omitted). Thus the Senators' and Florio letters, while certainly not "waste", are "hazardous" to the present purpose of statutory construction.

■ Moreover, the intent of the enacting Congress is not obscure. The legislative history makes clear that at the time of its passage, Congress intended Section 3001(i) to exempt ash from regulation under Subtitle C in order to pave the way for increased use of the resource recovery process. It may well be true that such an exclusion "lacks any justification on environmental grounds", Florio Letter at 1, but that is a judgment made with the benefit of hindsight and one that can be acted upon only by Congress, not by this Court.

### E. *New York Exclusion*

It is common ground that the DEC interprets the state exclusion, codified at 6 NYCRR § 371.1(e)(2)(i), to extend to ash residue. However, because "no State ... may impose any requirements less stringent than those authorized by [Subtitle C]", 42 U.S.C. § 6929, plaintiff argues that New York's interpretation of its own regulations is invalid under the federal scheme. Of course, that argument turns on the proper construction of Section 3001(i), and for the reasons discussed above I conclude

that to be the one set forth by the defendants and not that argued for by EDF.

Although the DEC's interpretation of its own exclusion, which contains language virtually identical to that of the federal statute, could be considered probative of the meaning of Section 3001(i), I need not look to such far removed evidence for a proper construction of the federal statute.

### II. *Defendants' Compliance with Section 3001(i)*

EDF further argues that even if defendants' construction of Section 3001(i) is correct, the Facility cannot advantage itself of the exclusion. That is so, plaintiff contends, because the Facility does not comply with the requirements of Section 3001(i)(1)(A)(ii) and 3001(i)(2). Specifically, EDF maintains that WTI and Resco have not established that they do not accept hazardous commercial or industrial waste for processing, and that the requisite contractual provisions are in place for ensuring that no such waste is accepted. Plaintiff contends that the lack of such compliance, or defendants failure to demonstrate such compliance on the present record, precludes the grant of summary judgment in defendants' favor.

### A. *Contractual Requirements*

■ EDF argues that defendants do not have in place the required mechanisms for ensuring that no "solid waste from commercial or industrial sources", RCRA Section 3001(i)(1)(A)(ii), is accepted for processing by the Facility. Plaintiff concedes that defendants have in place a series of procedural safeguards for guarding against the acceptance of hazardous waste, but it questions the adequacy of those safeguards. Additional factual background is required at this juncture to understand the contractual provisions at issue.

In 1974, the Westchester County Board of Legislators instituted a Solid Waste Disposal Plan for the County. Pursuant to that plan the County assisted municipalities within the County in their efforts to deal with disposal of municipal solid waste. Resource recovery was emphasized in those

efforts. Affidavit of Ronald J. Broglio dated March 19, 1988 at ¶ 5 ("Broglio Affidavit").

The County subsequently entered into Inter–Municipal Agreements ("IMA's") with 35 municipalities in the County. Those municipalities generate approximately 90% of the municipal solid waste in Westchester County. *Id.* at ¶ 6. The IMA's provide that each municipality deliver a minimum amount of the solid waste collected by the municipality to the County's solid waste disposal system.[17] A fee is paid for the disposal services. *Id.* The County's waste disposal system is operated through the District.

In 1981, Westchester County, the Westchester County Industrial Development Agency ("Agency"), and Wheelabrator–Frye Inc. entered into a Solid Waste Disposal Agreement ("Agreement"). That Agreement governs the disposal of waste at the Facility.[18]

17. The County's disposal system includes, but is not limited to the Facility and Sprout Brook. Also included in the County System are five waste transfer stations, all of which are located within the County itself. Broglio Affidavit at ¶ 7.

18. Resco consented to be bound by the Agreement pursuant to an Assignment and Assumption Agreement dated September 30, 1982.

On October 1, 1982, the County withdrew as a party to the Agreement. The Agency and the District then entered into a separate agreement, the Solid Waste Disposal Service Agreement ("Service Agreement"), which requires the District to deliver the solid waste received from the municipalities pursuant to the IMA's to the Facility for disposal. Under the Service Agreement, the District is essentially subject to the same requirements as is the Agency under the Agreement. Furthermore, the IMA's were assigned by the County to the District. Broglio Affidavit at ¶ 31.

19. The relevant portion of Section 5.04 reads as follows:

Notwithstanding any other provisions of this Agreement, Resco shall not be obligated hereby to take any action which, in its reasonable judgment, would result in the violation of any statute or governmental rule, regulation or requirement, including, without limitation, the Resource Recovery Conservation Act of 1976, or adversely affect the operation of the Facility. The Agency agrees to use its best efforts to take all necessary or appropriate action to ensure that the Facility does not become classified as a hazardous or toxic ma-

The Agreement states that the Facility is not designed to "store or process toxic, pathological, biological or other hazardous wastes which by law require special handling in their collection, treatment or disposal." Agreement at 2.03(b)(i). The Agreement further provides that Resco "operate the Project in compliance with all applicable federal, state and local laws and regulations ... relating to environmental control ... and other regulatory requirements." *Id.* at 5.04. Section 5.04 of the Agreement makes clear that Resco can refuse to take certain actions if in its judgment such actions would amount to a violation of any statute or governmental rule, including the RCRA.[19] That same provision requires the County to use its best efforts to ensure that the Facility is not classified as a hazardous waste facility, and that it will not contract for the delivery of or itself deliver special handling waste,[20]

terials storage or processing facility and, without limiting the generality of the foregoing, the Agency agrees that it will not, and will use its best efforts to cause the Municipalities not to, contract for the disposal by the Facility of any Special Handling Waste ... or of any other Solid Waste which ... may reasonably be expected to constitute Special Handling Waste ... or of any other Solid Waste which Resco reasonably determines and notifies the Agency is likely to cause damage to or adversely affect the operation of the Facility ... *provided* that neither the Agency nor any Municipality shall be required to separate out from Municipally Collected Solid Waste any Special Handling Waste included therein during normal municipal collections.
(emphasis in original).

20. Special Handling Waste is defined by the Agreement as follows:

(a) radioactive, toxic, pathological, biological and other hazardous wastes which according to federal, state or local rules or regulations from time to time in effect require special handling in their collection, treatment or disposal; (b) explosives and hazardous chemicals which are likely to cause damage to or adversely affect the operation of the Facility; (c) dirt, concrete and other nonburnable construction material and demolition debris; (d) large items of machinery and equipment, such as motor vehicles and major components thereof (transmissions, rear ends, springs, fenders), agricultural equipment, trailers and marine vessels, and other oversize items, including tree trunk sections and branches in

which includes hazardous waste, to the Facility. Analogous restrictions are found in the Service Agreement, the IMA's, and the contracts with the outside operator of the County's five transfer stations.

Furthermore, the truck drivers of those private carters who are authorized to deliver to the Facility for the County's account, are required to sign a certification as to the type of waste being delivered. In essence, the certification states that no hazardous waste or other prohibited substance is contained in the load.

Although the terms of Section 3001(i)(2) are clear in that only contractual requirements *or* notification *or* inspection procedures are required to comply with the statute, the Facility also has in place notification procedures. Specifically, a sign is posted in plain view of the trucks as they enter the Facility, the substance of which is a statement as to what types of waste the Facility will and will not accept for processing. Broglio Affidavit at ¶ 14. The trucks arriving at the Facility are subject to random inspection at any time. *Id.* at ¶ 16. Trucks arriving at the station must pass through a weigh station at which point their loads are checked with a radiation detection device. *Id.* at ¶ 15. Defendants represent that any load failing the radiation test is not accepted for processing. *Id.*

### 1. *Small Quantity Generators*

Plaintiff argues that defendants' contractual safeguards are inadequate because they do not account for hazardous waste produced by individuals or entities known in the regulatory scheme as "small quantity generators."[21] It is common ground that the hazardous waste produced by these small quantity generators is not exempted from classification as hazardous. *See* 40 C.F.R. § 261.4. However, it is exempt from many of the regulations governing the management of hazardous wastes. EDF argues that Section 3001(i) requires a

resource recovery facility to refrain from accepting hazardous wastes, including that produced by small quantity generators, and to maintain contractual safeguards which ensure that no such waste is accepted for processing.

Specifically, EDF contends that the provision regarding Special Handling Waste, *supra* at n. 20, does not ensure that hazardous waste from small quantity generators will not be accepted for processing. That is so, plaintiff maintains, because hazardous waste produced by small quantity generators does not require special handling and therefore would not come within the category of waste prohibited by the Agreement. Defendants maintain that a proper reading of the regulations reveals that the Facility is not required to turn away hazardous waste produced by small quantity generators, but that if it is so required under law, the proper procedural safeguards are in place.

I thus address whether, as a matter of law, hazardous waste produced by small quantity generators may be accepted by a resource recovery facility without that facility losing its exempt status under Section 3001(i). The pertinent regulation provides that the small quantity hazardous waste generator may deliver its waste to an off-site facility for disposal where such facility is "[p]ermitted, licensed, or registered by a State to manage municipal or industrial solid waste." 40 C.F.R. § 261.5(g)(3)(iv). It would make no sense to allow small quantity generators to dispose of their waste in a facility licensed to deal with municipal or industrial waste and then to deem that facility a hazardous waste disposal site subject to regulation as such. Such a construction would vitiate the right of the small quantity generator to contract for the disposal of its waste with a non-hazardous waste facility, which perforce would

excess of six feet in length and eight inches in diameter, which are likely to interfere with the operation of the Facility; and (e) other materials which are likely to cause damage to or adversely affect the operation of the Facility.
Agreement, Article I at 11.

**21.** The regulations promulgated by the EPA provide that "[a] generator is a conditionally exempt small quantity generator in a calendar month if he generates no more than 100 kilograms of hazardous waste in that month." 40 C.F.R. § 261.5(a).

become a hazardous waste facility upon acceptance of the small generator's waste.

I therefore hold that the Facility may accept hazardous waste from small quantity generators without subjecting itself to regulation as a hazardous waste disposal facility.[22]

### 2. *Requirement to Reject Hazardous Waste*

The second argument EDF makes in support of its contention that the procedural safeguards are inadequate is that defendants are nowhere required to reject hazardous waste if it is brought to the Facility for disposal. EDF relies principally on that portion of Section 5.04 of the Agreement, *supra* at n. 19, that states as follows: "neither the Agency nor any Municipality shall be required to separate out from Municipally Collected Solid Waste any Special Handling Waste included therein during normal municipal collections." Of course, that provision deals with what the municipalities must do in respect of separating out hazardous from non-hazardous waste.

However, the County and the Agency clearly remain under contractual obligation to use their best efforts to ensure that no Special Handling Waste, including hazardous waste, is delivered to the Facility. Agreement Section 5.04 and 5.06. No absolute guarantee is present in these precautions, and as a practical matter probably could not be given. In any event, none is required by the statute. 1985 Preamble, 50 Fed.Reg. at 28,725 ("the statutory language contains no exception [from the Section 3001(i) exemption] for facilities that, in spite of their best efforts, receive hazardous waste"). Consistent with the statute, the 1985 preamble requires only that "good

faith precautionary" measures against the acceptance of hazardous waste be in place. Nowhere is an absolute guarantee required.

Moreover, while the County and the Agency have made no absolute guarantees not to deliver hazardous waste for disposal, the operating permit obtained from the DEC expressly prohibits the processing of such waste. That permit provides as follows:

> Facility shall accept for incineration only municipally and commercially collected residential and commercial refuse. The following waste shall not be accepted at this facility: septage; sewage sludge less than 20% solids by weight; industrial waste (unless approved by this Department); liquid wastes, industrial sludges, explosive or other type of hazardous waste as listed in 6 NYCRR Part 366.

Permit at ¶ 1.[23]

In sum, the contractual provisions in place are adequate under the statute. Consequently, plaintiff's objection to the procedural safeguards maintained by the defendants fails.

### B. *Actual Receipt of Hazardous Waste*

EDF next argues that judgment cannot enter in favor of defendants on account of their failure to establish that hazardous waste is not actually accepted by the Facility. Plaintiff further maintains that even if defendants have made out a paper case on the point, judgment should not enter in advance of EDF's taking discovery pursuant to Rule 56(f).

---

**22.** This conclusion is consistent with the EPA's determination that "'[a] sanitary landfill that receives household wastes ... and only those hazardous wastes generated by small-quantity generators will not be considered a hazardous waste disposal facility and will not require a RCRA permit.'" Defendants' Reply Memorandum at 27–28 n.* (*quoting* U.S. Environmental Protection Agency, Questions and Answers on Hazardous Waste Regulations at New Facilities—Sanitary Landfills (1980), *quoted in,* J. Stensvaag, *Hazardous Waste Law & Practice* § 6.32 at 6–103 & n. 29 (1986)).

**23.** EDF argues that little comfort can be taken in the terms of the operating permit because Part 366 has been repealed. However, the DEC adopted successor Part 371 concurrent with the repeal of Part 366. Resco thus remains responsible for operating the Facility in compliance with Part 371 and "all applicable laws, rules or regulations, including rules and regulations of the department promulgated pursuant to subdivision one of section 27–0703 and taking effect after the date application [for the operating permit] was made to the department." N.Y. Envtl. Conserv. Law § 27–0707(5).

■ In order to qualify for the resource recovery exemption, a facility must not only have in place the appropriate procedural safeguards, Section 3001(i)(2), but must also not accept hazardous waste from commercial or industrial sources for processing. Section 3001(i)(1)(A)(ii). In other words, the Facility must show that the procedural safeguards it has in place work in keeping out hazardous waste.

■ The statute does not require a showing that absolutely no hazardous waste from the municipal waste stream is ever accepted for processing. Rather, the Senate Report says the following:

> [S]uch facilities cannot accept hazardous wastes identified or listed under section 3001 from commercial or industrial sources, and must establish contractual requirements or other notification or inspection procedures to assure that such wastes are not received or burned. This provision requires precautionary measures or procedures which can be shown to be effective safeguards against the unintended acceptance of hazardous waste. If such measures are in place, a resource recovery facility whose activities would normally be covered by the household waste exclusion should not be penalized for the *occasional, inadvertent receipt and burning of hazardous material from such commercial or industrial sources.* Facilities must monitor the waste they receive and, if necessary, revise the precautionary measures they establish to assure against the receipt of such hazardous waste.

Senate Report at 61 (emphasis added).[24]

Defendants represent that the Facility does not "knowingly accept or burn hazardous commercial or industrial waste." Supplemental Affidavit of Ronald J. Broglio sworn to on June 2, 1988 at ¶ 1. Defendants further state that "Resco would not in fact accept or process any such waste of which it was aware," *id.* at ¶ 4, and that "[i]f hazardous commercial or industrial waste were discovered at the Facility, Res-

co would not process [it]." *Id.* at ¶ 8. Accepting these statements as true, they focus on whether the Facility would knowingly burn hazardous waste, and the defendants state that they would not. Nowhere do defendants directly address the issue of the frequency with which hazardous waste is processed, however inadvertent such processing may be. The statute protects the Facility from regulation under Subtitle C only if the acceptance of hazardous waste is not only inadvertent, but occasional. Senate Report at 61.

Of course, the implication of defendants' statements is that the Facility does not process hazardous waste. That implication is not sufficient to carry the day on an affirmative defense. *See United States v. First City Nat'l Bank of Houston,* 386 U.S. 361, 366, 87 S.Ct. 1088, 1092, 18 L.Ed.2d 151 (1967) (party claiming "benefits of an exception to the prohibition of a statute" carries the burden of establishing that it comes within the exception).

Although EDF makes no particular showing that hazardous waste is in fact accepted by the Facility, it could not have done so as the facts necessary to that showing are within the exclusive control of defendants, and discovery has not yet been taken. Therefore, plaintiff argues that even if the representations of defendants are sufficient to establish that the Facility is deserving of protection under the statutory exclusion, discovery should proceed on that point prior to the entry of judgment. I agree. Rule 56(f) was created for just such a situation. The plaintiff cannot "present by affidavit facts essential to justify [its] opposition" as those facts are uniquely within the possession of the defendants.

Moreover, although plaintiff has made no particular showing that hazardous waste has been accepted by the Facility, there is some reason to believe that a possibility. Specifically, EDF asserts that "typical municipal wastestreams contain hazardous wastes contributed to the wastestreams by

---

**24.** The EPA is also of the view that "resource recovery facilities do not become Subtitle C facilities when they inadvertently burn hazardous waste if they have taken good faith measures to avoid burning such waste." 1985 Preamble, 50 Fed.Reg. 28,725.

small quantity generators, as well as hazardous wastes illegally contributed by other generators." Affidavit of Richard A. Denison sworn to on May 2, 1988 at ¶ 30. I therefore make the direction that discovery proceed in this case on an expedited basis, limited to the questions of whether and with what frequency the Facility accepts hazardous waste for processing.

### III. *Primary Jurisdiction*

■ Finally, defendants argue that the case should not be decided in this Court, but rather should be decided initially at the administrative level. Defendants state that the EPA is addressing the question of ash management in two separate agency actions and a decision by this Court should await determination of those proceedings. Specifically, defendants point to the EPA's review of New York's application for final approval of various provisions of its hazardous waste program, including the household waste exclusion;[25] and the EPA's expected issuance of technical guidance for the handling, transportation and disposal of ash.

The doctrine of primary jurisdiction is recognized as a "flexible concept, concerned with 'promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties.'" *Board of Educ. of City School Dist. v. Harris,* 622 F.2d 599, 606 (2d Cir.1979) (citation omitted), *cert. denied,* 449 U.S. 1124, 101 S.Ct. 940, 67 L.Ed.2d 110 (1981). On the subject of invoking the doctrine of primary jurisdiction, the Second Circuit has said:

> The exercise of the court's discretion is guided in this situation by a desire for uniformity of regulation and the need for

initial consideration by a body possessing special expertise on the issue presented. *Id.* (citations omitted). In exercising that discretion, the court of appeals has further said that "[i]t is well established that the courts need not defer to an agency where the issue involved is strictly a legal one, involving neither the agency's particular expertise nor its fact finding prowess." *Id.* at 607 (citations omitted); *see also General Elec. Co. v. MV Nedlloyd,* 817 F.2d 1022 (2d Cir.1987) ("courts ordinarily do not defer when the issue involved is purely a legal question, one not involving agency expertise or experience") (citation omitted), *cert. denied,* 484 U.S. 1011, 108 S.Ct. 710, 98 L.Ed.2d 661 (1988). The case at bar presents precisely such a situation.

The instant controversy centers on the proper construction of Section 3001(i), a purely legal issue. The policies underlying the primary jurisdiction doctrine would not be furthered by awaiting agency decision on that point. Moreover, the status of the administrative actions referred to is unclear. The EPA is clearly of the view that guidance on the proper construction of the exclusion is necessary. *See* Letter of Lee M. Thomas Administrator of the EPA to Congressman James J. Florio dated May 27, 1988 ("the issue is now the subject of several citizen suits ... and is likely to be resolved by judicial decision in the near future ... a legislative clarification on this issue would be very desirable").

### Conclusion

Plaintiff's motion for summary judgment is denied.

Defendants' motion to dismiss in favor of an agency determination is denied.

---

**25.** Although New York has received final approval for its state hazardous waste program generally, it has not yet been authorized to enforce any of the requirements or prohibitions of the 1984 amendments, including the household waste exclusion. Pursuant to Section 3006(g)(1), the strictures of the 1984 amendments are to be administered by the EPA pending final authorization of the state program. 42 U.S.C. § 6926(g)(1).

On December 28, 1987, EPA granted approval of New York's draft application concerning the household waste exclusion and gave New York until May 7, 1988 to submit its final application. The preliminary approval of the state's exclusion endorses the wording of the exclusion, which is identical to that promulgated by the EPA, but cannot fairly be read to sanction the DEC's interpretation of that exclusion. That imprimatur would come only with final approval of the application, which has not yet happened. To date, final approval has not been granted.

Defendants' motion for summary judgment is denied for the reasons stated herein. Expedited discovery is to proceed in accordance with the terms of this Opinion. An order of reference to a supervising Magistrate is being entered concurrent with this Opinion.

SO ORDERED.