**Ronald SANTELLA, Plaintiff,**

v.

**CITY OF CHICAGO, Defendant.**

**No. 86 C 6223.**

United States District Court, N.D. Illinois, E.D.

Sept. 12, 1989.

John L. Gubbins, John L. Gubbins and Associates, Ltd., Chicago, Ill., for plaintiff.

Judson H. Miner, Mary L. Smith, Corp. Counsel of Chicago, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Chicago Police Department ("CPD") employee Ronald Santella ("Santella") has sued the City of Chicago ("City"), claiming City violated 42 U.S.C. § 1983 ("Section 1983") and also breached an employment contract when it deprived him of a supervisory title in CPD's Motor Maintenance Division ("MMD") and then demoted him without affording him due process. This is the third time this Court has issued a substantive opinion in this case (both earlier opinions—"Opinion I," 654 F.Supp. 428 (N.D.Ill.1987) and "Opinion II," 672 F.Supp. 321 (N.D.Ill.1987)—dealt with motions to dismiss under Fed.R.Civ.P. ("Rule") 12(b)(6)). After those two opinions had carved away portions of Santella's then-asserted claims, Santella filed his two-count Second Amended Complaint currently at issue.

City has now moved for summary judgment under Rule 56. For the reasons stated in this memorandum opinion and order, its motion is granted as to Santella's Section 1983 claim, while his state-law breach of contract claim is dismissed under the principles of *United Mine Workers v. Gibbs*, 383 U.S. 715, 726–27, 86 S.Ct. 1130, 1139–40, 16 L.Ed.2d 218 (1966).

### Facts [1]

In April 1979 Jane Byrne ("Byrne") was sworn in as City's Mayor. On August 1 of

---

**1.** Familiar Rule 56 principles impose on the movant the burden of establishing the lack of a

that year Byrne appointed Joseph DiLeonardi ("DiLeonardi") as Acting CPD Superintendent (DiLeonardi Dep. 4; D. Ex. 1–D). Within a month after his appointment, DiLeonardi was told by Deputy Superintendent James Zurawski ("Zurawski") that CPD's Electronics and Motor Maintenance Division (a division of CPD's Bureau of Administrative Services) was infested with corruption (DiLeonardi Dep. 4–5). Apparently employees were stealing City property, overestimating damages and splitting the overstated cost of repairs, getting kickbacks on the sale of City vehicles below wholesale prices, sabotaging equipment— and generally "[y]ou name it, it was there" (Zurawski Dep. 7, 15–16).

Byrne responded to the scandal by granting broad authority to DiLeonardi (Byrne Dep. 9):

> I gave full authority to the acting superintendent to get to the bottom of the matter, to use the internal investigative units of the police department to look into it, cooperate with the Federal Government and to clean it up and make whatever modes, transfers or—terminations as necessary.

DiLeonardi in turn delegated responsibility to Zurawski—both Byrne and DiLeonardi told Zurawski "to clean the mess up and put an end to the scandal" (Zurawski Dep. 8).

Zurawski began his work by reorganizing: He split the Electronics and Motor Maintenance Division into MMD and the Electronics Maintenance Division ("EMD") (Zurawski Dep. 12). He then appointed Santella's brother Rick [2] to the position of MMD's Director (*id.*).

Zurawski believed a professional management staff was essential to solving the corruption problem (*id.* 10). He therefore began hiring supervisors for both MMD and EMD. Rick recommended his brother (Santella) for a supervisory position in MMD (*id.* 13).

In January 1980 Zurawski offered Santella the position of Supervisor of Motor Maintenance (Santella Dep. I 39). But there was a problem: No vacant supervisory title existed in City's 1980 Appropriation Ordinance. Santella, who at the time was an Investigator in CPD's Office of Professional Standards (D. Ex. 1–A), was reluctant to take the job (Santella Dep. I 47–48).

Zurawski told Santella that the absence of such a Supervisor's title in the budget was not a problem: Santella would perform supervisory duties but would be hired into a vacant title in the budget, an arrangement known as a "title in lieu" (Santella Dep. I 45). Zurawski represented that Santella's new position would be a career service position. In fact, Zurawski said he believes the only reason Santella eventually took the job was the job protection associated with career service status (Zurawski Dep. 18–19).

On January 11, 1980 DiLeonardi was replaced as Superintendent of Police (D. Ex. 1–E) by Richard Brzeczek ("Brzeczek"). On April 15, 1980 Matthew Rodriguez ("Rodriguez") was appointed Deputy Superintendent of the Bureau of Technical Services, replacing Zurawski as MMD's head (D. Ex. 1–G; D. Ex. 8 ¶ 1). On June 1, 1980 Santella received a provisional ap-

---

genuine issue of material fact (*Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). For that purpose this Court is called on to draw all "reasonable inferences, not every conceivable inference" in the light most favorable to the nonmovant—in this case Santella (*DeValk Lincoln Mercury, Inc. v. Ford Motor Co.,* 811 F.2d 326, 329 (7th Cir.1987)). That is the end of this Court's conventional procedural footnote in Rule 56 cases, but here one other matter requires comment. This District Court's General Rule 12(*l*) requires a party moving for summary judgment to submit a statement of material facts as to which there are no genuine issues. General

Rule 12(m) then requires the nonmovant to respond by admitting or controverting each paragraph of the movant's statement. City properly filed its Rule 12(*l*) statement, but Santella's Rule 12(m) response is really no such thing. That noncompliance on his part, along with his failure to provide adequate record references for his factual assertions, has made compilation of a factual summary inordinately difficult.

**2.** To avoid confusion "Santella" will refer to plaintiff Ronald Santella, while "Rick" will refer to his brother.

pointment to the position of Electrical Mechanic in MMD (D. Ex. 1–A). Zurawski's assistant Richard Joyce ("Joyce") confirms that DiLeonardi had delegated authority to Zurawski, that Santella's appointment was in lieu of the nonexistent Supervisor of Motor Maintenance title and that Santella had been promised he would be reclassified as soon as the appropriate title was approved by City (see generally Joyce Aff.).

On December 12, 1980 the Chicago City Council passed the 1981 Appropriation Ordinance. That Ordinance did include a new Supervisor of Motor Maintenance title (D. Ex. 3–F). But Santella was not placed in that position. In fact, that Supervisor title was included in the 1982, 1983 and 1984 budgets as well, but Santella was never reclassified from his title of Electrical Mechanic.

During each of those years Rick and Santella continually attempted to push the reclassification through the bureaucratic machinery. Numerous City employees were aware of the promises made to Santella and assured him the reclassification process was under way:

1. Former City Budget Director Albert Boumenot ("Boumenot") says he was aware of the promises made to Santella and he discussed the situation with City Patronage Chief Frank Santoro, Rick and various union representatives. He also approved the reclassification (Boumenot Aff. ¶¶ 5–7).

2. Former Administrative Assistant to the Mayor Carl Bator was also aware of Santella's situation. Joyce says he spoke with Brzeczek, who told him he was aware of Santella's situation and had approved his reclassification. That was relayed to Santella (Joyce Aff. ¶¶ 8–9).

3. Former City Comptroller Anthony Fratto ("Fratto") says he too was aware of Santella's situation. He says Deputy Superintendent Dennis Nowicki ("Nowicki") told him Brzeczek had approved the reclassification and Nowicki had personally submitted the required paperwork (Fratto Aff. ¶ 7).

4. Rodriguez also assured Santella the reclassification was under way (Santella Dep. I 80; Rick Dep. 33, 38).

5. Finally, Rick also assured Santella he would be reclassified (Santella Dep. II 28).

During preparation for the 1985 budget Rick eliminated the Supervisor of Motor Maintenance title and included a new "General Supervisor of Motor Maintenance" title. On August 17, 1984 Richard Grishaber ("Grishaber") replaced Rick as MMD's Director. Grishaber determined Santella was no longer needed to perform the job he had been doing for Rick and ordered Santella to work as an electrical mechanic effective November 5, 1984 (*id.* ¶¶ 6–7). Santella suffered a job-related injury on October 24, 1984 (he reported it on October 25) and was granted a disability leave of absence (*id.* ¶ 8; D. Ex. 9–A). He is still on disability leave (Santella Dep. I 4; D. Ex. 12–A ¶ 31; D. Ex. 12–B ¶ 31).

### Section 1983 Claim

Opinion I, 654 F.Supp. at 431–33 outlines the applicable legal principles for establishing a due process claim. Suffice it to say that Santella asserts (1) he has a property interest in MMD's supervisory title (along with the job benefits and protections of that title) and (2) he was deprived of that property interest without due process.

*Shlay v. Montgomery*, 802 F.2d 918, 921 (7th Cir.1986), quoting *Munson v. Friske*, 754 F.2d 683, 692 (7th Cir.1985), teaches:

[I]n the employment context . . . a property interest can be created in one of two ways: (1) "by an independent source such as state law securing certain benefits;" or (2) by "a clearly implied promise of continued employment."

As discussed in Opinion I, Santella Mem. [13–17][3] asserts that City officials, vested with authority to bind City, promised him the supervisory title and hence entered into an employment contract.

---

**3.** Santella's Memorandum was submitted without page numbers, a mysterious—and inconvenient—phenomenon that seems to be growing among practitioners. This Court has been compelled to supply the numbers, shown in this opinion with brackets.

City responds with a two-pronged counterattack:

1. Those who promised Santella the supervisory title were without authority to do so.

2. Santella has failed to comply with the provisions of City's Personnel Rules ("Rules") that govern appointments to career service positions.

Opinion I, 654 F.Supp. at 432–33 confirms that Santella could not have a legitimate expectation of receiving MMD's supervisory title if those who promised him that title lacked authority to make the promise or acted in contravention of a State law or City regulation.

To analyze those issues properly, it is necessary to provide a good bit of background on City's appointment procedures. This opinion turns to that task first.

### 1. *City's Appointment Process*

Since 1975 City has included at least one Supervisor of Motor Maintenance title in its budget (D. Ex. 4 ¶ 7). During the years 1981–84 a second (and unfilled) such title was placed in the budget. That Supervisor title is a "career service" title (*id.*).

Under the Rules[4] an employee can have career service status in only one title (Rule VIII § 5). Such a career service title carries with it certain benefits and job protection. Importantly, once an employee has acquired career service status in a position, he or she cannot be discharged without receiving due process as provided in the Rules: Under the Rules such discharges are limited to those for cause, with the employee entitled to a pre-discharge hearing on that score (D. Ex. 2 ¶ 17).

Because a career service title does obligate City to provide various procedural protections, City has understandably established a rigid procedure for obtaining such appointments. Under the Rules an applicant must follow a series of steps:[5]

1. He or she must complete an application on forms prescribed by the Commissioner (Rule IV § 4).

2. Once proper application is made and the individual is determined to be qualified, he or she may take the career service examination.

3. Once the applicant has successfully passed the examination and a possible background investigation, his or her name is placed on a general employment list, ranked either numerically by final score or categorically in groups of relative excellence (Rule VII §§ 3–4).

4. When a department head wants to fill a vacant career service position, he or she submits a requisition to the Commissioner for certification of persons eligible to fill the vacancy (Rule VIII § 1).

5. That certification draws in the first instance on the layoff, reinstatement, reemployment and promotional lists for a title. If those lists are exhausted, the general employment list is used (Rule VIII § 2).

6. Appointment to the vacant career service position by the department head is limited to a choice among the persons certified by the Commissioner (Rule VIII § 5).

7. To effectuate an appointment to a career service position, final written authorization must be made by the department head, the Commissioner, the Budget Director and the Comptroller on a Personnel Action Report Form (PER–14) (D. Ex. 2 ¶ 30).

8. Upon appointment to a career service position, the appointee must serve a one-year probationary period (unless the Commissioner specifies a shorter period) (Rule 14 § 1).

Code § 11–6 charges the CPD's Superintendent with the responsibility and the authority for appointments to positions in the

---

4. Between 1980 and July 1, 1985 the Rules were revised a number of times. All the revisions were minor, involving no substantive change that impacts on this case. This opinion will refer to the Rules in effect through June 1980 (set out as D. Ex. 2–A). Later versions of the Rules appear as D. Ex. 2–B through 2–E.

5. City's Commissioner of Personnel ("Commissioner"), formerly called the Director of Personnel, promulgates the Rules under the authority granted him by City's Municipal Code ("Code") § 25.1–5 (D. Ex. 3–D).

CPD. That authority is subject to the civil service provisions (D. Ex. 3–B). Thus under the Code and the Rules only the Superintendent (as the "department head" specified in the Rules) has the authority to appoint people to career service positions within the CPD.

Aside from an appointment that complies with the Rules, it appears the only other way for anyone to achieve career service status is by operation of an Appropriation Ordinance. Under the Rules issued November 15, 1982 and December 13, 1983 there was a non-career-service classification of City employees known as the "Departmental Employment Service" ("DES," with apologies to the pharmaceutical industry) (D. Ex. 2 ¶ 15). By operation of the 1984 Annual Appropriation Ordinance all DES employees became probationary career service employees as of January 1, 1984 and, upon successful completion of a six-month probationary period, achieved career service status on July 1, 1984 (*id.* ¶ 39). It was by that process that Santella achieved career service status in the position of Electrical Mechanic on July 1, 1984 (D. Ex. 1–A).[6]

One additional matter needs explanation at this point. To comply with Illinois law (Ill.Rev.Stat. ch. 24, ¶¶ 8–2–1 to 8–2–8[7]), City's Appropriation Ordinances are divided into eight separate categories (Section 8–2–4)—here the "Personal Services" category is the relevant one. In each City Appropriation Ordinance a total dollar amount for Personal Services is allocated to each City department. City then breaks down that total allocation into the amounts budgeted for each title in the department. City Appropriation Ordinance § 6 precludes the ap-

pointment of personnel to titles not designated in the ordinance (D. Ex. 3–E through 3–J).

That restriction (akin to a line-budget limitation by job title and amount) has proved a bit too rigid in practice. To provide City's departments with the flexibility needed to handle personnel problems, it has become a clearly established City policy to use "titles in lieu." If a department head wants to hire someone for a job *not* included as a title in the budget detail, he or she finds a vacant title in the budget and appoints the person to that title "in lieu of" the unavailable one. In such a situation the employee cannot be paid more than what was allocated for the vacant title (Boumenot Supp.Aff. Ex. 10).

In Santella's case that meant he was appointed as an Electrical Mechanic in lieu of the initially nonexistent Supervisor of Motor Maintenance title. Santella performed supervisory duties but lacked the official title. Usually the missing title is added to the next budget and the employee is then reclassified into the correct title. In Santella's case, however, the title was added to the budget but he was never reclassified.

City's long-established use of that title-in-lieu procedure as a hiring device is consistent with Illinois law. Section 8–2–6 expressly provides that detailed schedules (such as City's listing of titles) are not considered an official part of the appropriation ordinance. Hence as long as sufficient funds remain in the particular department's Personal Services account, the department head may hire a person via the title-in-lieu process.[8] But as the later dis-

---

6. Santella Mem. [20–21] points out that the 1981 Appropriation Ordinance conferred career service status on employees holding a provisional appointment (defined in Rule III § 4) (See D. Ex. 3–D). Santella then attempts to use that 1981 ordinance to challenge City's assertion that career service status could be achieved in only two ways: by complying with the Rules or via the 1984 Appropriation Ordinance. In reality, however, that argument only underscores the principle that career service status may be achieved only by limited and formal means. Santella can derive no mileage from the fact that three rather than two such formal means

might have existed over the years—he did not satisfy any of them in any event.

7. All further statutory references will simply take the form "Section—," referring to the Chapter 24 numbering.

8. This conclusion supersedes this Court's earlier ruling that any promises made to Santella before December 12, 1980 could be of no effect because they violated Section 8–1–7 (Opinion II, 672 F.Supp. at 329–30). When Opinion II was written, only that statutory provision had been cited to this Court by the parties. Santella's

cussion will reflect, such hiring (that is, giving someone a job) is *not* the same as conferring the legal title of Supervisor (the only thing in which Santella could even arguably seek to assert the "property" interest needed to implicate the Due Process Clause).

As noted, the title-in-lieu *hiring* practice is long-established. In fact City's Personnel Policy Manual contemplates such a procedure and provides forms for the process (see Fratto Supp.Aff. Ex. 7–10).

### 2. *Promises to Santella*

 In light of the legal limitations that control City's appointment process, this case—despite the massive amount of paper the parties have submitted on the current motion—is really quite simple. It is undisputed that Santella has never received an appointment to the Supervisor title. Santella Mem. [11–12] does assert he complied with the application and testing procedures, so that a PER–14 reclassification form was executed by the appropriate persons (including Nowicki on behalf of Brzeczek, Budget Director Boumenot, Comptroller Fratto and Commissioner Charles Pounian). But the bottom line is that the only person with ultimate authority to have made the appointment was and is CPD's Superintendent, and no Superintendent (including Brzeczek) has ever appointed Santella to the Supervisor's title. In fact, Nowicki testified that such an appointment requires the actual issuance of an order by the Superintendent that results in reclassification—an order that no one ever issued (Nowicki Dep. 91–92).

To recapitulate, during Santella's tenure with MMD three people held CPD's Superintendent post: DiLeonardi, Brzeczek and Fred Rice, Jr. ("Rice").[9] None of them ever officially appointed Santella to the Supervisor title (D. Ex. 4 ¶¶ 3–4), and Santella concedes that (as he must).

Instead Santella argues that while he may not have been officially appointed, he was promised by Zurawski and then reassured by a number of people—including Rodriguez and Brzeczek—that he would be reclassified. Though this Court accepts Santella's assertions as true (as it must on the current motion), he must still lose here because he was never appointed by a Superintendent in compliance with City's Rule.[10] Promises, however well-intended and sincere, cannot take the place of the required formal action. Such promises are legally unenforceable against City, for they would violate the procedure established by the Rules. Nothing in the applicable statutes and Rules, or in Illinois case law construing and applying them, gives even the Superintendent the authority to bind the City to a career service appointment when the proper procedures have not been followed.[11]

---

counsel had not then explained the title-in-lieu administrative process, nor had he provided this Court with any other information for evaluation of the issue. Even on the current motion it took two additional submissions requested by this Court from Santella's lawyer to clarify his position. In any case, what the conclusion now stated in the text has meant is that *all* promises made to Santella—both before and after December 12, 1980—have been evaluated on the current motion. As it turns out, those earlier promises cannot salvage Santella's Section 1983 claim either.

9. Rice was appointed by Mayor Harold Washington on August 23, 1983 (D. Ex. 1–F; D. Ex. 6 ¶ 1).

10. At least to the extent Santella claims a promise by ex-Superintendent Brzeczek, that would have to be viewed with a somewhat jaundiced eye if that testimony were being weighed at trial rather than being accepted on the current Rule 56 motion. Rodriguez says he submitted Santella's requests for reclassification to Brzeczek in 1981 and 1982 and to Rice in 1983, but none of the requests was ever approved (D. Ex. 8 ¶ 5). Both Brzeczek and Rice say they never authorized Santella's reclassification to the Supervisor title (D. Ex. 5 ¶ 3; D. Ex. 6 ¶ 3)—seemingly an odd thing for Brzeczek to have failed to do over a two-year span if he had really made the promise that Santella claims but that Brzeczek himself flatly denies. What controls, though, is not that credibility issue but rather the fact that the essential formal requirements were never taken by any Superintendent. And Zurawski concedes that *he* lacked authority to make career service appointments on his own (Zurawski Dep. 21–22).

11. This analysis highlights the inherent limitations of a Section 1983 action, as contrasted with a state law claim advanced in the state courts, in this type of case. Because the exist-

Undaunted, Santella Mem. [13–15] also contends Mayor Byrne had the authority to bind City. Santella characterizes the scandal at MMD as an emergency "requiring immediate responsive action and the implementation of plans to prevent future occurrences" (Santella Mem. [13]). He says that in such emergencies Code § 3–11 (D. Ex. 3–A) authorizes the Mayor to take emergency action:

The mayor shall be ex-officio co-ordinator of activities in cases of emergency resulting from any explosion, fire, flood, riot, storm or other cause requiring concerted measures for the maintenance of public peace and order, the preservation of life and property and the relief of suffering, or for any of these purposes. He shall formulate and, as occasion therefor arises, he shall execute plans for the prevention of such emergencies so far as possible and for meeting them effectively when they arise. Obedience to his orders in executing such plans and meeting such emergencies is obligatory upon all departments and heads of departments and upon all other officers and employees of the city of Chicago.

It should be recalled that Byrne delegated authority to DiLeonardi, who in turn delegated part of that authority to Zurawski. Zurawski then offered Santella the job as Supervisor. It is through that chain of reasoning (or chain of command) that Santella seeks to bind City.

But Santella's argument is weak at its first link. For two separate reasons this Court rejects the contention that Byrne had authority to bind City to a career service appointment in this case.

First, the scandal at MMD simply cannot qualify as an "emergency" under Code § 3–11. Clearly the situation was not one "requiring concerted measures for the maintenance of public peace and order, the preservation of life and property and the relief of suffering." That conclusion flows not only from the quoted language standing alone, but also from the application of familiar ejusdem generis principles (under which that generalized language should be read in conjunction with the specifically-identified true emergencies: "explosion, fire, flood, riot, storm"). Nothing indicates a problem of such nature and magnitude as to call into play the Mayor's Code-specified emergency powers.

Second, there is nothing in established Illinois law even hinting that if such an emergency *did* exist, the Mayor could by-pass the Rules and independently make career service appointments. Certainly nothing in Code § 3–11 suggests such a sweeping power—a power that would be directly at odds with the detailed procedures established by the Rules. For example, it might well be that the Mayor could under such circumstances cause someone to be *hired* temporarily to deal with the emergency—but to infer any mayoral power to confer career service status, with its corollary consequences, in the teeth of the formal prerequisites for that status would be a very different (and impermissible) thing indeed.

Only one other issue merits attention: the effect if any of the title-in-lieu process on appointments to career service positions. Santella's Memorandum repeatedly refers to the title-in-lieu procedure, but he never really addresses what impact that custom has on the analysis here.

To be sure, an established policy or custom may evidence a mutually explicit understanding (*Davis v. City of Chicago*, 841 F.2d 186, 188 (7th Cir.1988)). But it is not enough for Santella to have proffered

---

ence of a property interest is a prerequisite to a party's invocation of the Due Process Clause, and because such property interests by definition derive from state law (*Polenz v. Parrott*, 883 F.2d 551, 555 (7th Cir.1989)), this Court is not free to engage in adventuresome exploration beyond the frontiers marked out by existing state law in that respect. If on the other hand the *state* courts were inclined to expand the rights of someone in Santella's position by finding promises such as those on which he relies to be enforceable even in the absence of such formal action, they would be free to do so—and Santella is free to seek that result via his non-Section 1983 claim that this opinion dismisses without prejudice. And to complete the hypothetical, if the state courts were to do so, *that* would create a property interest, so that a *future* litigant in Santella's situation could call upon the Due Process Clause and Section 1983.

the evidence he has. Nothing in what he has tendered creates any reasonable inference that *career service status*—as contrasted with mere job hiring—could be granted via the title-in-lieu process. Rather it appears that the use of titles in lieu was and is simply a convenient method of complying with state and local budget regulations. Santella's own evidence repeatedly demonstrates that the title-in-lieu process serves "payroll purposes only" (Fratto Supp.Aff. ¶ 5; Pascale Aff. ¶ 9; Burke Aff. ¶ 7).

Thus the title-in-lieu custom really has no impact at all on the ultimate issue. On that score Santella has presented no evidence that any City employee *with authority* made an *enforceable* promise to provide him the Supervisor of Motor Maintenance title, a title that under law may be conferred only via formal steps that were never taken. That lack of a property interest in the title dooms Santella's Section 1983 claim (Opinion I, 654 F.Supp. 429–32).

### Breach of Contract Claim

Santella has also asserted a pendent state law claim for breach of contract against City. At least in surface terms that claim might be thought to fail for the same reason that the Section 1983 claim does: No one with authority to bind City entered into a contract with Santella.

But what this Court has really found (as it was required to) is that Santella lacks an established property interest under state law. And as n. 11 suggests, where state law doctrines supply the rule of decision this Court is not empowered to extend those doctrines as the state courts themselves may choose to do (cf., e.g., *Gust K. Newberg Construction Co. v. E.H. Crump & Co.*, 818 F.2d 1363, 1368 (7th Cir.1987)). Under those circumstances it would be unfair to treat with Santella's state claim on the merits now—instead the prudent path is to follow the teaching of *UMW v. Gibbs*, 383 U.S. at 726–27, 86 S.Ct. at 1139–40 and dismiss that claim without prejudice. Accord, *Grubb v. W.A. Foote Memorial Hospital, Inc.*, 741 F.2d 1486, 1500 (6th Cir. 1984), cited favorably in *Gust K. Newberg*.

### Conclusion

Santella never received an appointment to the Supervisor of Motor Maintenance title in compliance with the Rules. That means no one with authority gave him an enforceable promise that could confer the title on him. Consequently there are no disputed issues of material fact as to Santella's lack of a due-process-protected property interest. City is entitled to a judgment as a matter of law on Santella's Section 1983 claim, which is therefore dismissed with prejudice. But Santella's state law claim, lacking as it does an independent base for federal jurisdiction, is dismissed without prejudice. Accordingly this action is dismissed in its entirety.[12]

---

**12.** When Santella filed his memorandum in opposition to City's Rule 56 motion, he also filed numerous affidavits as evidentiary support for his position. City responded with a Rule 12(f) motion to strike. This Court then granted the motion to the extent the affidavits were not based on personal knowledge. But those submissions—whether or not based on personal knowledge—are really irrelevant in any case. Santella's witnesses continually emphasize that various employees have the power to *hire*. But as the text discussion reflects, the real issue here is the power to confer "career service" status, not the power to hire. Thus the tendered affidavits added nothing to the analysis.