Ronald SANTELLA, Plaintiff–Appellant,

v.

CITY OF CHICAGO,
Defendant–Appellee.

No. 89–3188.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 7, 1990.

Decided July 9, 1991.

---

John L. Gubbins, Gubbins & Associates, Robert P. Sheridan, Chicago, Ill., for plaintiff-appellant.

Kelly R. Welsh, Ruth M. Moscovitch, Appeals Div., Jean Dobrer, Asst. Corp. Counsel, and L. Anita Richardson, Corp. Counsel, Office of the Corp. Counsel, Chicago, Ill., for defendant-appellee.

Before BAUER, Chief Judge, POSNER, and RIPPLE, Circuit Judges.

BAUER, Chief Judge.

It has been said that when it comes to getting a city job in Chicago, quite often "It ain't what you know, but who you know." Although he thought he did, Appellant Ronald Santella did not know the right people—or, at least, not enough of them. Santella was hired by the Motor Maintenance Division ("Division") of the Chicago Police Department ("CPD") on June 1, 1980. His brother Rick just happened to be the director of the Division. Santella thought he was going to be a motor maintenance supervisor, a "career service" position that carries with it certain job protections, including a grievance procedure and for-cause disciplinary procedure with notice and hearing. Santella soon found out, however, that only one motor maintenance supervisor position existed, and it already was filled. So Santella was appointed instead to a vacant slot, that of electrical mechanic (now a career service position, but not at the time Santella was hired).

In the ordinary world, when one applies for a job that is held by someone else, that is the end of the matter. The City of Chicago takes a somewhat different approach. When it chooses to do so, the City will hire individuals into a vacant title "in lieu of" another, unavailable position. The individual is paid out of funds allocated to the department for personnel services. The "true" title is assigned after it is included in the following year's budget.

The hiring "in lieu of" scheme commonly is used, even though the City has a perfectly good set of Personnel Rules in place. The Rules are promulgated by the City Director of Personnel pursuant to the Chicago Municipal Code. They require that a person complete seven steps prior to appointment to a career service position. Briefly, the applicant first must fill out an employment application. Then, he must take and pass a career service examination. Next, his name must be placed on the general employment list in rank order based on his examination score. Once these steps have been completed, an applicant becomes eligible for appointment to an existing career service title, but no appointment may be made until the Personnel Commissioner sends the department head a list of eligible candidates for the position and the applicant's name is selected from the list. Thus, according to the Rules, the Superintendent of Police—the department head of the CPD—is the only official with the authority to make career service appointments within the CPD. If the department

head selects one of the certified applicants from the list, then the following individuals must sign off on the appointment on a "PER–14" form: the department head, the Personnel Commissioner, the Budget Director, and the Comptroller.

Santella did not jump through any of these hoops because he was an electrical mechanic "in lieu of" of the motor maintenance supervisor position. All in all, it was not a bad deal; he received the higher motor maintenance supervisor's salary. At first, he was reluctant to take the job because of the somewhat ephemeral nature of the title and because he wanted the added protection of career service status. James Zurawski, the Deputy Superintendent of the Police Department's Bureau of Administrative Services (the organizational unit that included Santella's department), assured Santella that an additional motor maintenance supervisor title would be included in the 1981 budget and that he would be appointed to that title. Santella's brother Rick told him the same thing. Both were half right. Another supervisory title *was* added to the City's Annual Appropriations Ordinances for 1981 through 1984. Rick Santella even prepared the official form to facilitate his brother's reclassification to "Supervisor of Motor Maintenance." Although the form was approved by all levels of the CPD and was submitted to the Department of Personnel, the position remained vacant.

While waiting for reclassification, both Santella and his brother made sure that City officials were kept aware of the situation. Several of them were prodded into action. The City Budget Director reviewed the matter with the patronage chief, the union, and Santella's brother, and then approved the reclassification. After Santella's department underwent a reorganization and became the Bureau of Technical Services, CPD Deputy Superintendent Matt Rodriguez, who had been appointed to oversee the Bureau, assured Santella (through Rick) that he would receive the supervisory title. Both the Administrative Assistant to the Mayor and the City Comptroller were told by CPD higher-ups that Richard Brzeczek (one of the three individuals who held the post of Superintendent of Police during these events) had approved Santella's change of title. That information was relayed to Santella. In reality, not Brzeczek, Joseph DiLeonardi (his predecessor), or Fred Rice (his successor) ever authorized the appointment.

In 1984, Rick was replaced as head of the Division by Richard Grishaber. Grishaber assured Santella that he could continue to perform supervisory duties, but mere assurances were not enough for Santella. After patiently waiting for reclassification for more than four years, he decided to file a grievance. When Grishaber got wind of this plan, he informed Santella that he would not be receiving the motor maintenance supervisor title after all because of department reorganization. Grishaber also told Santella that another employee would be assuming Santella's supervisory duties and responsibilities. Grishaber ordered Santella to work as an electrical mechanic (a job, by the way, for which Santella was unqualified) or face termination. Since then, things have not gone well for Santella. He did not win his grievance. He never worked as an electrical mechanic because he suffered a job-related injury on October 24, 1984. He has been on disability leave ever since.

Santella filed a three-count complaint against the City and Grishaber, individually and in his official capacity as Commander of the Motor Maintenance Division of the CPD. He alleged that defendants breached his employment agreement and violated 42 U.S.C. § 1983 by depriving him of the supervisory title that he had been promised and by demoting him in violation of the Due Process Clause of the Fourteenth Amendment. Santella further claimed that the demotion violated the First Amendment because it was taken in retaliation for his filing a grievance. In two opinions, *Santella v. Grishaber*, 654 F.Supp. 428 (N.D. Ill.1987) and *Santella v. Grishaber*, 672 F.Supp. 321 (N.D.Ill.1987), the district court dismissed Grishaber from the case and dismissed Santella's first amendment count. Many of Santella's other claims either were dismissed or withdrawn. The breach of

employment contract claim survived "to the extent it [was] based on alleged contractual commitments made while appropriations for the Supervisor position were in place." 672 F.Supp. at 330. The district court directed Santella to file an amended complaint to clarify exactly what commitments were made to him during the relevant period.

Santella did just that. In a second amended complaint, he listed the several occasions on which City officials had promised him the supervisory title. He alleged that, through these promises, he had acquired a property interest in the title and was deprived of that interest without due process of law and in violation of state contract law. As before, he asked for declaratory and injunctive relief and lost compensation and benefits. The district court granted the City's motion for summary judgment on the grounds that Santella could not have acquired a property interest in the title because the City officials who promised it to him did not have the authority to make such a promise. The court also ruled that Santella failed to qualify for the position under the City's Personnel Rules. *Santella v. City of Chicago*, 721 F.Supp. 160, 167 (N.D.Ill.1989). The pendent state breach of contract claim was dismissed without prejudice to allow Santella to pursue it in state court.

■ We review *de novo* the district court's grant of summary judgment to the City. "[W]e must decide whether the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to the judgment as a matter of law." *Wolf v. City of Fitchburg*, 870 F.2d 1327, 1329 (7th Cir.1989). A genuine issue of material fact exists only when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). If the evidence presented by the nonmovant is merely colorable or is not significantly probative, summary judgment is proper. *Id.* at 249–50, 106 S.Ct. at 2510–11.

■ Did Santella have a protected property interest in the supervisory title? The district did not think so because "the only person with ultimate authority to have made the appointment was and is CPD's Superintendent, and no Superintendent (including Brzeczek) has ever appointed Santella to the Supervisor's title." *Santella*, 721 F.Supp. at 165. To counter that argument, Santella primarily relies on *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), a case in which a nontenured college professor was denied renewal of his annual contract without a hearing. The professor alleged that he had a property interest in his employment fostered by the college administration having written in its official faculty guide that a faculty member should feel secure that he had permanent employment as long as his work was satisfactory. The Supreme Court stated that, "A person's interest in a benefit is a 'property' interest for due process purpose if there are such rules or *mutually explicit understandings* that support his claim of entitlement to the benefit...." *Id.* at 601, 92 S.Ct. at 2699 (emphasis supplied).

The assurances given to Santella that he would be reclassified cannot be considered such "mutually explicit understandings." We indicated in *Wolf* that it is now "firmly established" that "the 'mutually explicit understandings' that constitute property interests under the holding of *Perry* cannot be based on the representations of government officials who are not authorized to make such representations." 870 F.2d at 1334. *See also Shlay v. Montgomery*, 802 F.2d 918, 923 (7th Cir.1986) (city corporation counsel's promise that a new hire would have a career position is unenforceable against the city and thus does not give rise to a property right); *Hadley v. County of DuPage*, 715 F.2d 1238, 1242 (7th Cir. 1983) (no entitlement to public employment where county board not bound by unauthorized assurances of continued employment by individual board members), *cert. denied*, 465 U.S. 1006, 104 S.Ct. 1000, 79 L.Ed.2d 232 (1984). The City Personnel Rules unequivocally state that the department head —here, the Superintendent of Police—is

the only individual vested with the authority to make career service appointments within his own departments. Promises may have been made to Santella. They might even have been made by some very influential people. But because they were not made by the only person who counted, they were unauthorized, nonbinding, and without legal effect.

■ The district court had yet another reason for holding that Santella could not have had a legitimate expectation of receiving the supervisory title: the officials who assured him that the reclassification was a "done deal" were acting in contravention of City regulations that mandate a set procedure for career service appointments. The district court put it succinctly: "Promises, however well-intended and sincere, cannot take the place of the required formal action." *Santella*, 721 F.Supp. at 165. Santella agrees with the district court that career service positions must be secured by the procedures set forth in the Personnel Rules, but he and the court part company over the role of the hiring "in lieu" scheme. Santella contends that in addition to the procedures provided in the Personnel Rules, hiring "in lieu" represents a second, *de facto* method of obtaining a job title in Chicago and that he had every right to rely upon it to support his claim of entitlement. He believes that the district court fundamentally misunderstood how hiring "in lieu" works, in that the court concluded that "the title was something independent from the position it described, and that reclassification was a special undertaking which was, under the system, contingent and uncertain even though hiring to the position had been accomplished." Appellant's Brief at 32. Santella suggests that, in his case, appointment to a nonconforming title in lieu of his "actual" title was purely for budgetary reasons. The reclassification of title was "to reflect the reality" of the position that he already held. *Id.* at 31. He insists that because he was hired *de facto* for the position of supervisor, and performed the role of supervisor, he was entitled to enjoy the benefits of the position.

Santella's argument seems to be that "in lieu" hiring results in *automatic* accession to a position once it is created, funded, or included in the annual budget. The district court disagreed and determined that merely giving someone a job "is *not* the same as conferring the legal title of Supervisor (the only thing in which Santella could even arguably seek to assert the 'property' interest needed to implicate the Due Process clause)." *Id.* (emphasis in original). Like the district court, we find that Santella has come up empty-handed. He has failed to muster any facts to support a theory that title "in lieu" is tantamount to an actual appointment to a career service position. Santella's evidence describes in detail how the "in lieu" system works and suggests that "in lieu of" hiring was for payroll purposes only, but nowhere does it state that movement to a career service title is a *fait accompli* once a hiree starts drawing a salary and the "proper" title is added to the annual budget. A good example is the affidavit of Anthony Fratto, former City Comptroller. Fratto stated that after a City department requests that the individual be hired into a specific job title "in lieu of" a vacant title, his salary comes out of the department's personnel service account. The title then is included in the next appropriation ordinance and the paperwork at City Hall reflects the change. This much we know, but there is no statement to the effect that a person in such a position somehow magically ascends to the title reflecting his actual job duties. To the contrary, Fratto acknowledged that such a hiring arrangement would fall apart if there were no available funds in the personnel services account and the City intended to pay for the services from an account earmarked for items other than personnel services.

Hiring "in lieu" is an established policy that has provided the City of Chicago with greater flexibility to handle personnel problems. The City's Personnel Policy manual refers to hiring "in lieu" and even provides forms for the process. With hiring "in lieu," a department head need not be hampered by rigid appropriation rules when a particular person is essential for a job and

no position is available. With hiring "in lieu," it also is possible to endrun the bureaucracy in order to finagle a spot on the City payroll for a close relative. Despite the fact that the practice has been around for a while, it is no substitute for personnel rules providing for formal application and approval by a department head. Nor is it sufficiently certain to give rise to a legitimate property interest in the titles to which "in lieu" hirees aspire. Thus, for the reasons discussed in this opinion, the judgment of the district is

AFFIRMED.