ENVIRONMENTAL DEFENSE FUND,
INC., et al., Plaintiffs–Appellants,

v.

The CITY OF CHICAGO, et al.,
Defendants–Appellees.

No. 90–3060.

United States Court of Appeals,
Seventh Circuit.

Argued May 10, 1991.
Decided Nov. 19, 1991.

Leslie A. Jones, Northwestern University Legal Clinic, R. Edward Wilhoite, Jr. (argued), Despres, Schwartz & Geoghegan, Chicago, Ill., Karen Florini, Washington, D.C., for plaintiffs-appellants.

Nancy Marren, Henry L. Henderson, Mardell Nereim (argued), Lawrence Rosenthal, Deputy County Counsel, Kelly R. Welsh, Asst. County Counsel, Office of the Corp. Counsel, Chicago, Ill., for defendants-appellees.

Before BAUER, Chief Judge, POSNER, and RIPPLE, Circuit Judges.[*]

BAUER, Chief Judge.

In this case, we are asked to determine whether the ash generated by a municipal solid waste incinerator is "hazardous waste" that must be disposed of in accordance with the provisions of Subtitle C of the Resource Conservation and Recovery Act of 1976, 42 U.S.C. § 6901–6992k ("RCRA"). The incinerator in question— the Northwest Waste-to-Energy Facility— has been owned and operated by the City of Chicago ("the City") since 1971. Faced with rapidly diminishing space for landfill, the City has turned to innovative methods to dispose of the approximately 2.5 million tons of solid waste generated each year. The Northwest Facility was one of the first modern waste-to-energy resource recovery facilities in the United States and the only one in the State of Illinois. Each day, it receives for processing 200 to 250 truckloads of refuse, the bulk coming from residential units. The plant incinerates 350,000 tons of waste annually. The steam generated from the combustion of waste is used to run the facility.

report may be germane to the issues presented in this case, we decline the ICC's invitation.

[*] This opinion was circulated among all judges of this court in regular active service pursuant to Circuit Rule 40(f) because of an apparent conflict with *Environmental Defense Fund v. Wheelabrator Technologies*, 725 F.Supp. 758 (S.D.N.Y.1989), *aff'd*, 931 F.2d 211 (2d Cir.1991). No judge favored rehearing *en banc*; Judge Richard D. Cudahy did not participate.

The plaintiffs, the Environmental Defense Fund, Inc., and Citizens for a Better Environment (collectively, "EDF"), filed a complaint against the City and its mayor alleging that the City violated provisions of RCRA and its regulations governing the handling of hazardous waste. EDF maintains that the City is violating RCRA by unlawfully storing, transporting, disposing of, and otherwise handling the by-product of the incineration at the Northwest Facility, the 110,000 to 140,000 tons of ash produced every year. According to the EDF, the toxicity level of the ash is high enough to qualify it as a hazardous waste subject to special treatment under Subtitle C of RCRA. Between 1981 and 1987, thirty-five samples of ash from the Northwest Facility were tested. Out of these, thirty-two exhibited enough lead, cadmium, or both, to meet the standard for Extraction Procedure toxicity, which forms a part of Subtitle C.

Subtitle C establishes a regulatory scheme governing the treatment, storage, and disposal of hazardous wastes. (Nonhazardous waste is governed by Subtitle D of RCRA.) Generators of hazardous waste must apply for and receive a United States EPA identification number before engaging in the treatment, storage, disposal, transportation, or offering for transportation of hazardous waste. *See* 40 C.F.R. § 262.12. Before shipping, hazardous waste must be packaged, labelled, and marked according to specific regulations. *See* 40 C.F.R. § 262.30–33. Hazardous waste must be accumulated in approved containers and only for specified periods of time. 40 C.F.R. § 262.34. Generators of hazardous waste also must maintain certain records, and file biennial reports with the EPA Regional Administrator. *See* 40 C.F.R. § 261.40–.43. The ash produced by the Northwest Facility is not dealt with pursuant to this "cradle to grave" regulatory scheme. Instead, it is shipped off to Michigan for burial in a landfill site that is not licensed to accept hazardous wastes.

In the district court, the parties filed cross motions for summary judgment. The City argued that the ash produced at the Northwest Facility is exempt from regulation under section 3001(i) of RCRA, 42 U.S.C. § 6921(i), which provides that a resource recovery facility will not be deemed to be "treating, storing, disposing of, or otherwise managing" hazardous wastes for the purposes of regulation if the facility meets certain requirements. In addition to filing its own motion for summary judgment, EDF also opposed the City's motion on the ground that the City had not demonstrated that the Northwest Facility met the requirements of section 3001(i).

On November 29, 1989, the district court issued a memorandum and order, holding that section 3001(i) exempted the ash produced at resource recovery facilities from regulation as a hazardous waste. *See Environmental Defense Fund v. City of Chicago*, 727 F.Supp. 419, 424 (N.D.Ill.1989). The district court, however, denied both motions for summary judgment, allowing EDF additional discovery to determine whether the Chicago facility met the requirements of section 3001(i). In July 1990, EDF stipulated that it would not contest the adequacy of the Northwest Facility's procedures for excluding hazardous wastes and that it would not oppose a renewed motion for summary judgment by the City. On August 20, 1990, the district court granted the City's renewed motion for summary judgment. This appeal followed.

This case turns on the construction of section 3001(i). To make sense of this statute, we must sort through conflicting, often confusing, pronouncements from Congress and the EPA. Indeed, the EPA's various interpretations of the statute have muddied the waters to such an extent that courts have failed to give it the deference normally accorded to an agency's construction of a statute it administers. *See, e.g., Environmental Defense Fund v. City of Chicago*, 727 F.Supp. at 424; *Environmental Defense Fund v. Wheelabrator Technologies*, 725 F.Supp. 758, 766 (S.D.N.Y.1989), *aff'd*, 931 F.2d 211 (2nd Cir.1991). The Second Circuit, the only appeals court to interpret section 3001(i) thus far, concluded that the statute exempts the ash remaining after the incineration of mu-

nicipal solid waste at a resource recovery facility from regulation as a hazardous waste. *Wheelabrator,* 931 F.2d at 213.

■ As a threshold issue, we must consider whether, as the City suggests, this case has been rendered moot by passage of the 1990 amendments to the Clean Air Act. Section 306 of the amendments provides in part that "[f]or a period of 2 years after the date of enactment ... ash from solid waste incineration units burning municipal waste shall not be regulated by the Administrator of the Environmental Protection Agency pursuant to Section 3001 of the Solid Waste Disposal Act." Pub.L. No. 101–549, 104 Stat. 2399 (1990). When Congress enacted this provision, it was well aware that this matter was pending on appeal. The accompanying committee report explains, "[t]he conferees do not intend to prejudice or affect in any manner ongoing litigation, including *Environmental Defense Fund v. Wheelabrator, Inc.,* 725 F.Supp. 758 (2d Cir.) [sic] and *Environmental Defense Fund v. City of Chicago,* Appeal No. 90–3060 (7th Cir.) [sic], or any State activity regarding ash." H.Rep. No. 952, 101st Cong., 2d Sess. 335, 342, *reprinted in* 1990 U.S.Code Cong.Admin.News 3385, 3867, 3874.

What all this means is that the amendments to the Clean Air Act do not render this matter moot, but rather maintain the status quo until the time Congress reauthorizes RCRA. After that period expires, Congress may determine whether it wishes to revise the statute with regard to the ash question. Although we cannot say for certain, it well may have been that Congress wanted to see what the courts had to say on the issue before undertaking any retooling of the current regulatory scheme. Until then, the EPA is precluded from promulgating regulations on ash pursuant to section 3001(i). Nothing in the amendments, however, suggests that the EPA may not enforce the scheme now in place. What that covers, exactly, is for us to determine.

Having concluded that the matter properly is before us, we turn our attention to the district court's decision. As with all summary judgment determinations, we review the matter *de novo* to decide whether the record as a whole establishes that the defendant was entitled to judgment as a matter of law. *See, e.g., Santella v. City of Chicago,* 936 F.2d 328, 331 (7th Cir.1991); *Dieckhoff v. Severson,* 915 F.2d 1145, 1148 (7th Cir.1990). Before we can proceed, we must trace our way through a somewhat complicated statutory and regulatory scheme.

In 1980, EPA issued the "household waste exclusion," a regulation that explicitly exempted household waste from the statutory definition of "hazardous waste." *See* 45 Fed.Reg. 33,120 (codified as amended at 40 C.F.R. § 261.4(b)(1) (1987)). The exclusion had the effect of releasing households and municipalities from the burden of complying with the cumbersome requirements of Subtitle C. In the preamble to the regulation, the EPA stated that, "[s]ince household waste is excluded in all phases of its management, residues remaining after treatment (*e.g.,* incineration, thermal treatment) are not subject to regulation as hazardous waste." *Id.*

Congress never ratified this statement in the form of legislation. Instead, it enacted section 3001(i) in 1984 as part of the Hazardous and Solid Waste Amendments to RCRA to "clarify" the EPA's household waste exclusion. (Actually, Congress was interested in excluding from the extremely complex regulations that apply to facilities that specifically target hazardous waste municipal incinerators that inadvertently process hazardous materials that slip in with all the other junk.) Section 3001(i) provided the following:

A resource recovery facility recovering energy from the mass burning of municipal solid waste shall not be deemed to be treating, storing, disposing of, or otherwise managing hazardous wastes for the purposes of regulation under this subsection if—

(1) such facility—

(A) receives and burns only—

(i) household waste (from single and multiple dwellings, hotels, motels, and other residential sources), and

(ii) solid waste from commercial or industrial sources that does not contain hazardous waste identified or listed under this section. . . .

42 U.S.C. § 6921(i).

Unlike the EPA preamble, section 3001(i) does not explicitly exempt the ash generated from resource recovery facilities from regulation as a hazardous waste. Nonetheless, each party to this litigation argues that the plain words of section 3001(i) support its position. The EDF contends that the section 3001(i) exemption covers only very specific activities of municipal incinerators that handle household and commercial waste, including "treating, storing, disposing of, or otherwise managing hazardous wastes," but not the generating of hazardous wastes. In contrast, the City maintains that "managing" hazardous wastes covers everything that a resource recovery facility does, including the disposal of the ash residue resulting from incineration of municipal solid wastes.

The EPA's interpretation and the legislative history of the statute do little to resolve this stand-off. Following adoption of section 3001(i), the EPA incorporated its provisions into EPA regulations. *See* 40 C.F.R. § 261.4(b)(1). In a preamble to the new regulations, the EPA explained:

The statute [section 3001(i)] is silent as to whether hazardous residues from burning combined household and non-household, non-hazardous waste are hazardous waste. These residues would be hazardous wastes under present EPA regulations if they exhibited a characteristic. The legislative history does not directly address this question although the Senate report can be read as enunciating a general policy of non-regulation of these resource recovery facilities if they carefully scrutinize their incoming wastes. On the other hand, residues from burning could, in theory, exhibit a characteristic of hazardous waste even if no hazardous wastes are burned, for example, if toxic metals become concentrated in the ash. Thus, the requirement of scrutiny of incoming wastes would not assure non-hazardousness of the residue.

EPA believes that the principal purpose of section 3001(g) [sic] was to prevent resource recovery facilities that may inadvertently burn hazardous waste, despite good faith effort to avoid such a result, from becoming subject to the Subtitle C regulations.

50 Fed.Reg. 28,725–26 (July 15, 1985).

Although not an all-out endorsement, this statement certainly runs in favor of subjecting the ash by-product of incineration to Subtitle C regulation. But was, as the EPA suggests, the legislative history silent on the ash question? Both the *Wheelabrator* district court, as affirmed by the Second Circuit, and the district court here held that the legislative history of RCRA demonstrates that Congress intended to exempt resource recovery facilities— and the ash they produce—from hazardous waste statutes and regulations. *See Environmental Defense Fund v. City of Chicago*, 727 F.Supp. at 424; *Wheelabrator*, 725 F.Supp. at 770. For support, both courts heavily rely on a statement in the Report of the Senate Committee on Environment and Public Works, which accompanied the proposed legislation. The Report stated that all waste management activities of such facilities are included within the household waste exclusion, including "the *generation*, transportation, treatment, storage and disposal of waste. . . ." S.Rep. No. 284, 98th Cong., 2d Sess. 61 (1983) (emphasis supplied). The *Wheelabrator* district court indicated that the Report "could not be more explicit":

It includes the term "generation," that term upon which EDF places so much emphasis. While it is true that the legislation itself does not include the term generation and that it is the legislation with which we are concerned, the legislative history is probative on the issue of Congress' intent, given that the scope of the statute is unclear on its face.

725 F.Supp. at 765.

But was congressional intent, as suggested by the *Wheelabrator* district court, that "explicit?" On October 2, 1987, six senators and a member of the House (Representative Florio) sent two letters to Lee

Thomas of the EPA. Both letters struck the same notes. Only the first letter, signed by Senators Stafford, Durenberger, Chafee, Burdick, Baucus, and Mitchell, is reproduced here:

> We are writing to urge that the Agency [EPA] refrain from issuing any policy statements or legal interpretations of the Resource Conservation and Recovery Act as it relates to the management of ash generated by municipal solid waste incinerators pending further consultation and coordination with Congress. We are concerned that the Agency may be on the verge of interpreting these requirements, possibly in a manner inconsistent with the law, at a time our Committee is considering legislation specifically resolving this issue.
>
> In our view, section 3001(i) of the Solid Waste Disposal Act, often known as RCRA, as amended in 1984 does not exempt owners or operators of municipal solid waste incinerators from their obligations: 1) to determine whether the ash residues generated by the incineration process are hazardous wastes, and 2) to handle ash exhibiting hazardous waste characteristics as hazardous wastes in accordance with the requirements of Subtitle C of RCRA. Thus, we concur in the Agency's statement in the preamble to the July 15, 1985 codification rule that in the 1984 amendments Congress did *not* "exempt the regulation [sic] of incinerator ash from the burning of non-hazardous waste in resource recovery facilities if the ash routinely exhibits a characteristic of hazardous waste."

*Regulation of Municipal Solid Waste Incinerators: Hearings on H.R. 2162 before the Subcommittee on Transportation and Hazardous Materials of the House Committee on Energy and Commerce,* 101st Cong., 1st Sess. 1–2 (May 11, 1989) ("Hearings on H.R. 2162").

In another development, on May 11, 1989, Congressman Thomas A. Luken, Chairman of the House Subcommittee on Transportation and Hazardous Materials, called a hearing on a proposed bill to regulate municipal solid waste incinerator ash under Subtitle D of RCRA. The Congressman made the following comments in his opening statement:

> A statutory ambiguity has caused a great deal of uncertainty with respect to how this ash should be regulated. The very basic question of whether or not ash should be regulated under subtitle D, as a solid waste, or under subtitle C as a hazardous waste, remains ambiguous in the statute.... This uncertainty has been exacerbated by conflicting signals sent by the EPA. That is not a criticism of EPA. Originally the EPA stated that incinerator ash must be tested for toxicity, and managed accordingly, but more recently the EPA has made various pronouncements which conflict with that original policy. It has become clear that legislative action is needed.

With regard to the EPA's lack of clarity on the subject, the "conflicting signals" to which Congressman Luken was referring begin with the preamble to the household waste exclusion. It most definitely exempted ash from regulation as a hazardous waste. The preamble to the regulation that mirrored section 3001(i), however, did not regard the statute as exempting from regulation ash exhibiting characteristics of hazardous waste. This difference is not explained away by later statements from EPA officials. In December 1987, J. Winston Porter, the Assistant Administrator for the Office of Solid Waste and Emergency Response, testified before the Senate Subcommittee on Hazardous Waste and Toxic Substances of the Committee on Environment and Public Works. Porter responded to a question regarding incinerator ash:

> Currently, EPA's regulations merely restate the statutory language. In the preamble codifying this statutory language, however, EPA advanced an interpretation of the statute that would subject ash residue's [sic] from energy-recovering MWC's [Municipal Waste Combustors] to Subtitle C regulation if the ash exhibited a characteristic of hazardous waste. The Agency has reexamined that interpretation and now concludes that it may have been in error. The

Agency believes that the language and legislative history of Section 3001(i) were probably intended to exclude these ash residues from regulation under Subtitle C.

It seems clear that Congress' interest in Section 3001(i) was to encourage energy recovery. Under the section, the reach of the household exclusion was to be extended for facilities that recover energy. The Agency's prior interpretation of the section would restrict the exclusion with respect to ash residue for facilities that recover energy as well as those that do not. This appears inconsistent with the reach of the household exclusion itself (which clearly covers ash). It also appears inconsistent with the expressed legislative intent that "[a]ll waste management activities of such a facility, including the generation, transportation, treatment, storage, and disposal of waste shall be covered by the exclusion."

Hearings on H.R. 2162, 16–17 (testimony of J. Winston Porter).

Just a few months later, in May 1988, Sylvia Lowrance, who was at that time the Director of the EPA's Office of Solid Waste, offered the following testimony to the same congressional hearing:

In our codification of [section 3001(i)] we stated that, in our view, the provision excludes energy recovery facilities burning household waste along with nonhazardous waste from commercial and industrial sources from regulation under subtitle C.

With regard to the ash, however, produced from such facilities, we said in a 1985 notice that the ash generated by these facilities which exhibits a characteristic of the hazardous waste must be managed as a hazardous waste.

We continue to follow that 1985 policy, and that is our current interpretation. However, there is substantial controversy surrounding that interpretation. We are in litigation challenging the EPA's interpretation of section 3001(i). We believe the law is ambiguous given it is silent with regard to treatment of ash under that section.

We do believe it needs to be clarified. What we believe is of paramount importance is that ash be safely managed in a technically sound matter [sic].

Until this legal controversy is resolved, there is going to continue to be uncertainty on the part of communities trying to deal with their garbage crisis with regard to what ultimate requirements and cost will be for their municipal and waste management.

We very much support an approach such as the one taken in H.R. 2162, which would provide clear authority to the EPA to regulate municipal combustor ash as a special waste under subtitle D of RCRA.

*Id.* at 33 (testimony of Sylvia Lowrance).

So there you have it. In construing a statute, we ordinarily have many tools at our disposal: the language and apparent purpose of the statute, its background and structure, its legislative history, and the bearing of related statutes. What we have to work with here is a statute subject to varying interpretations, a foggy legislative history, and a waffling administrative agency. Where do we turn? The seesawing statements from the EPA to which the district court gave "little weight" deserve no weight at all. The Report of the Senate Committee on Environment and Public Works, which accompanied the proposed legislation, included the generation of waste within the household waste exclusion. Can we just ignore the Report, even though the word "generating" is nowhere to be found in the enacted statute?

It has been argued, both in this circuit and, most notably in the Supreme Court opinions of Justice Antonio Scalia, that recourse to legislative history to clarify the meaning of statutory language is, at best, a shaky endeavor. Justice Scalia has written that use of legislative history

is neither compatible with our judicial responsibility of assuring reasoned, consistent and effective application of [statutes], nor conducive to a genuine effectuation of congressional intent, to give leg-

islative force to each snippet of analysis ... in committee reports that are increasingly unreliable evidence of what the voting Members of Congress had in mind. *Blanchard v. Bergeron,* 489 U.S. 87, 99, 109 S.Ct. 939, 947, 103 L.Ed.2d 67 (1989) (Scalia, J. concurring in part and concurring in the judgment). And as our Brother Easterbrook has noted regarding preenactment legislative history,

> [it] is a poor guide to legislators' intent because it is written by the staff rather than by members of Congress, because it is often losers' history ..., because it becomes a crutch ..., because it complicates the task of execution and obedience (neither judges nor those whose conduct is supposed to be influenced by the law can know what to do without delving into legislative recesses, a costly and uncertain process).

*Matter of Sinclair,* 870 F.2d 1340, 1343 (7th Cir.1989). In addition, post-enactment statements, such as we have here, bear no necessary relationship to the forces at work at the time of enactment: the preferences of the enacting legislator and his or her constituency and the impact of pressure groups.

Every time Congress enacts legislation, it is acting in context. Although "[l]egislative history may be invaluable in revealing the setting of the enactment and the assumptions its authors entertained about how their words would be understood," *Sinclair,* 870 F.2d at 1342, statements made before and after enactment are not necessarily the final word as to meaning. Congress was well aware of the EPA's position on ash when it enacted section 3001(i). Although tossed around, the word "generation" was not used in the final product. Why should we, then, rely upon a single word in a committee report that did not result in legislation? Simply put, we shouldn't. The actual words of the statute—the end product of the rough-and-tumble of the political process—are the definitive statement of congressional intent.

Our task becomes simpler if we just begin with what the statute actually says. *See Watt v. Alaska,* 451 U.S. 259, 265, 101 S.Ct. 1673, 1677, 68 L.Ed.2d 80 (1981). Section 3001(i) mentions "the treating, storing, disposing of or otherwise *managing*" of the household and commercial waste," but fails to include among these activities *generating* a different waste product entirely. To borrow a phrase from computer programmers, resource recovery quite literally is "garbage in, garbage out," but the "garbage" that emerges from the incineration process—ash—is fundamentally different in its chemical and physical composition from the plastic, paper, and other rubbish that goes in. It does not follow that the generation of hundreds of tons of a whole new substance with the characteristic of a hazardous waste should be exempt from regulation just because Congress wanted to spare individual households and municipalities from a complicated regulatory scheme if they inadvertently handled hazardous waste. Such a reading of section 3001(i) would be inconsistent with RCRA's policy of encouraging the careful management of materials that pose a danger to human health and the environment.

Moreover, contrary to the City's assertions, "otherwise managing" and "generating" are not coextensive terms. Statutory construction is a holistic endeavor: the only permissible meaning is that which is compatible with the "flesh and bones" of a law, from its overarching purpose down to its individual words. Here, the individual words in RCRA are so carefully defined, they cannot be interchangeable. Hazardous waste "management" is defined to include a limited number of activities, including the "collection, source separation, storage, transportation, processing, treatment, recovery, and disposal of hazardous wastes." 42 U.S.C. § 6903(7). The statute goes on to define some of these terms. Two of the most important words for our purposes are defined in the following manner. "Treatment" means:

> any method, technique, or process, including neutralization, designed to change the physical, chemical, or biological character or composition of any hazardous waste so as to neutralize such waste or so as to render such waste nonhazardous, safer for transport, ame-

nable for recovery, amenable for storage, or reduced in volume. Such term includes any physical activity or processing designed to change the physical form or chemical composition of hazardous waste so as to render it nonhazardous.

42 U.S.C. § 6903(34). The term "disposal" means:

the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.

42 U.S.C. § 6903(3). These definitions exclude "generation," which is separately defined as "the act or process of producing hazardous waste." 42 U.S.C. § 6903(6). There is no overlap whatsoever, then, between hazardous waste "management" and hazardous waste "generation." It follows, therefore, that if the language of the exclusion is limited to "management" activities of resource recovery facilities, "generating" activities are subject to regulation.

■ We should take at face value a statute's plain language so long as our reading is not absurd; we should ignore a legislative history that results in a reading that is. It is unlikely that Congress, in an express effort to promote the proper disposal of dangerous substances that otherwise would seep into the ground and water table, would sanction the dumping of massive amounts of hazardous waste in the form of ash into ordinary landfills. Accordingly, we hold that the ash generated from the incinerators of municipal resource recovery facilities is subject to regulation as a hazardous waste under Subtitle C of RCRA. The decision of the district court is

REVERSED.

RIPPLE, *Circuit Judge*, dissenting. For the reasons set forth in *Environmental Defense Fund v. Wheelabrator Technologies*, 725 F.Supp. 758 (S.D.N.Y.1989), *aff'd*, 931 F.2d 211 (2d Cir.1991), I would affirm the judgment of the district court.